1  Travis Middleton
2  27 West Anapamu Street No. 153
   Santa Barbara, California 93101
3  Travis_m_93101@yahoo.com
   (805) 284-6562
4  Pro Se



FILED
CLERK, U.S. DISTRICT COURT

AUG 10 2016

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

5

6

7

8              UNITED STATES DISTRICT COURT
9              CENTRAL DISTRICT OF CALIFORNIA
                      WESTERN DIVISION
10

11  Travis Middleton, Eric Durak, Jade      )  Incorporated Case No.:
    Baxter, Julianna Pearce, Candyce        )  LA CV16-05224-SVW-AGR
12  Estave, Denise Michele Derusha,         )  VERIFIED 1st AMENDED
13  Melissa Christou, Andrea Lewis, Rachil  )  COMPLAINT FOR:
    Vincent, Jackie Kozak, Don              )
14  Demanlevesde, Jessica Haas, Paige       )  1. VIOLATION OF THE
15  Murphy, Christie Macias, Lori Strantz,  )  RACKETEERING INFLUENCED
    Anwanur Gielow, Lisa Ostendorf,         )  AND CORRUPT ORGANIZATIONS
16  JuliaAnne Whitney, Pam Corner, Jodie    )  ACT ("RICO") 18 U.S.C. §§ 1961,
17  Tisserand, Andy Taft, Alice Tropper,    )  1962(a)(b)(c), 1964 (a)(c);
18  Bret Nielsen, Brent Haas, Muriel        )  a). 1503-Obstruction of Justice
    Rosensweet, Marina Read,                )  b). 1952-Racketeering
19                                          )  c). 1951- Extortion of Liberty Under
20            Plaintiffs,                    )     Color of Official Right
                                            )  d). 175-178- Illegal Use of Biological
21        vs.                               )     Weapons
22  Richard Pan, Win-Li Wang, Martin        )  e). 229-229F- Illegal Use of Chemical
23  Jeffrey "Marty" Block, Cindy Block,     )     Weapons
    Gerald A. "Jerry" Hill,  Sky Hill, Holly)
24  Mitchell, Catharine Baker, Dan Baker,   )  42 U.S.C. §§ 1983 & 1986
25  Christina Garcia, Adrin Nazarian, Diana )
    Nazarian, Jim Wood, Jane Wood, Ben      )  COMMON LAW JURISDICTION
26  Allen, Kevin de Leon, Hannah-Beth       )  UCC 1-103.6
27  Jackson, George Eskin, Jeff Stone,      )
    Richard Bloom, Robbie Black, Bill       )  DEMAND FOR JURY TRIAL
28  Quirk, Laurel Quirk, Lorena Gonzalez,   )  REQUEST LEAVE TO AMEND

Reginald Jones-Sawyer, Isadore Hall, )
Mark Leno, Douglas Jackson, Bob )
Wieckowski, Sue Lemke, David Chiu, )
Candace Chen, Evan Low, Anthony )
Rendon, Annie Lam, Jim Beall, Robert )
Hertzberg, Mike McGuire, Erika )
McGuire, Lois Wolk, Bruce Wolk, Jim )
Cooper, Kristen Cooper, Kevin )
McCarthy, Judy McCarthy, Mark Stone, )
Kathy Stone, Edmund G. Brown Jr., )
Anne Gust, The State of California and )
DOES 1 through 10, )
)
)
Defendants. )
(*Defendant Legislators are sued in their* )
*individual & official capacities*) )

---

# COMPLAINT

COMES NOW Plaintiffs, bringing this Incorporated Case, under the American Flag of peace, and states:

Ex rel.: for the people of the united states; "…But it is the manner of enforcement which gives Title 42 U.S.C. 1983 its unique importance, for the enforcement is placed in the hands of the people." Each citizen "acts as a private attorney general who takes on the mantle of the sovereign, guarding for all of us the individual liberties enunciated in the constitution." Section 1983 represents a balancing feature in our government structure whereby individual citizens are encouraged to police those who are charged with policing us all. Thus, it is of special importance that suits brought under this statute be resolved by a determination of truth." Wood v. Breir, 54 F.R.D. 7, (1972).

Both statutes [RICO and Clayton Act] bring to bear the pressure of "private attorneys general" on a serious national problem for which public prosecutorial resources are deemed inadequate; the mechanism chosen to reach the objective in both the Clayton Act and RICO is the carrot of treble damages. [Agency Holding Corp. v. Malley-Duff & Associates][107 S.Ct. 2759, 483 U.S. 143, 151 (1987)][bold emphasis added]. In rejecting a significantly different focus under RICO, therefore, we are honoring an analogy that Congress itself accepted and relied upon, and one that promotes the objectives of civil RICO as readily as it furthers the objects of the Clayton Act. Both statutes share a common congressional objective of encouraging civil litigation to supplement Government efforts to deter and penalize the respectively prohibited practices.

The object of civil RICO is thus not merely to compensate victims but to turn them into prosecutors, "private attorneys general," dedicated to eliminating racketeering activity. [3] Id., at 187 (citing Malley-Duff, 483 U.S., at 151). (Civil RICO specifically has a "further purpose [of] encouraging potential private plaintiffs diligently to investigate"). The provision for treble damages is accordingly justified by the expected benefit of suppressing racketeering activity, an object pursued the sooner the better. [Rotella v. Wood et al., 528 U.S. 549 (2000)] [bold and underline emphases added]. This Incorporated Case affirms evidence of multiple constitutional and civil right violations pursuant to 42 USC 1983, which has inflicted irreparable harm on Citizens of the State of California, all of the above named Plaintiffs, Parties Injured. This Incorporated Case may identify acts prohibited under 18 U.S.C. 1961 through 18 U.S.C. 1964 and by enforcement, committing the undersigned into "involuntary servitude" in violation of the Thirteenth Amendment to the United States Constitution and or under "full faith and credit" of the united States of America.

Definition: "Case Incorporated", the formation of a legal body, with the quality of perpetual existence and succession. (2). Consisting of an association of

numerous individuals. (3). Matters relating to the common purpose of the association, within the scope of the powers and authorities conferred upon such bodies with the quality of perpetual existence and successions. Ref. Black's Law Dictionary 67th Pg. 690. "Case Incorporation" will establish the legal bounds of the members of this lawful assembly to solve a specific "Case Number" and the issues in motion.

Additionally, all of the above named Plaintiffs in the above-captioned matter submit their Complaint as follows:

## STATEMENT OF THE CASE

-When injustice becomes law, rebellion becomes duty-.

In 1932 the U.S. Public Health Service began a study of the natural progression of untreated syphilis in rural African-American men in Alabama under the auspices of receiving free health care from the United States government. It was called the "Tuskegee Study of Untreated Syphilis in the Negro Male." The study initially involved 600 black men – 399 with syphilis, 201 who did not have the disease. The study was conducted without the benefit of patients' informed consent. Researchers told the men they were being treated for "bad blood," a local term used to describe several ailments, including syphilis, anemia, and fatigue. In truth, they did not receive the proper treatment needed to cure their illness. In exchange for taking part in the study, the men received free medical exams, free meals, and burial insurance. Although originally projected to last 6 months, the study actually went on for 40 years and ended officially in 1972. Their doctors had no intention of curing them of syphilis at all. The data for the experiment was to be collected from autopsies of the men, and they were thus deliberately left to degenerate under the ravages of tertiary syphilis—which

can include tumors, heart disease, paralysis, blindness, insanity, and death. "As I see it," one of the doctors involved explained, "we have no further interest in these patients until they die." In the summer of 1973, an attorney named Fred Gray filed a class-action lawsuit on behalf of the study participants and their families. In 1974, a $10 million out-of-court settlement was reached. As part of the settlement, the U.S. government promised to give lifetime medical benefits and burial services to all living participants. The Tuskegee Health Benefit Program (THBP) was established to provide these services. In 1975, wives, widows and offspring were added to the program. In 1995, the program was expanded to include health as well as medical benefits. The Centers for Disease Control and Prevention was given responsibility for the program, where it remains today in the National Center for HIV/AIDS, Viral Hepatitis, STD, and TB Prevention. The last study participant died in January 2004. The last widow receiving THBP benefits died in January 2009.  On June 13 of 2015 the State of California implemented a new version of The Tuskegee Experiment. It is now known as bill *SB277*. The California Vaccine Mandate. See attached as ***Exhibit A***. All of the named Defendants knew before hand of the toxic list of ingredients that are in these inoculations including but not limited to:

aluminum hydroxide, aluminum phosphate, ammonium sulfate, amphotericin B, animal tissues: (pig blood, horse blood, rabbit brain), dog kidney, monkey kidney, chick embryo, chicken egg, duck egg, calf (bovine) serum, betapropiolactone, fetal bovine serum, formaldehyde (embalming fluid), formalin, gelatin, glycerol, human diploid cells (originating from human aborted fetal tissue), hydrolized gelatin, mercury thimerosol (thimerosal, Merthiolate(r)), monosodium glutamate (MSG), neomycin, neomycin sulfate, phenol red indicator, phenoxyethanol (antifreeze).

Data on phenoxyethanol (antifreeze) can be seen here at the National Center for Biotechnology Information. PubChem Compound Database; *CID=31236, https://pubchem.ncbi.nlm.nih.gov/compound/31236 (accessed Apr. 7, 2016)*.

ALTERNATIVE and IN VITRO TESTS/ in vaccines/biologics, preservatives are used to prevent microbial growth. The present study examined: (1) the comparative toxicities of commonly used preservatives in US licensed vaccines to human neurons; and (2) the relative toxicity index of these compounds to human neurons in comparison to bacterial cells. Using human neuroblastoma cells, the relative cytotoxicity of the levels of the compounds commonly used as preservative in US licensed vaccines was found to be phenol <2-phenoxyethanol < benzethonium chloride < Thimerosal. The observed relative toxicity indices (human neuroblastoma cells/bacterial cells) were 2-phenoxyethanol (4.6-fold) < phenol (12.2-fold) < Thimerosal (>330-fold). In addition, for the compounds tested, except for 2-phenoxyethanol, the concentrations necessary to induce significant killing of bacterial cells were significantly higher than those routinely present in US licensed vaccine/biological preparations.

None of the compounds commonly used as preservatives in US licensed vaccine/biological preparations can be considered an ideal preservative, and their ability to fully comply with the requirements of the US Code of Federal Regulations (CFR) for preservatives is in doubt. Future formulations of US licensed vaccines/biologics should be produced in aseptic manufacturing plants as single dose preparations, eliminating the need for preservatives and an unnecessary risk to patients. Abstract: PubMed.

It is also listed as a hazardous substance under: U.S. Clean Air Act (CAA), U.S. Department of Transportation (DOT) and the U.S. National Toxicology Program (NTP) 11th Report Part A "Known to be Human Carcinogens".

**Aluminum hydroxide & aluminum phosphate:**

Aluminum is put into vaccines as an adjuvant purportedly to help them "work better" or to "enhance" them. It begs the question, to help them do what better exactly? Maim and kill people? Aluminum is present in food, air, water, and soil and is said to be harmless when swallowed because the body doesn't absorb it well. But aluminum put directly into the blood stream is another matter. - See more at: http://www.westonaprice.org/health-topics/vaccination/adjuvants-in-vaccines/#sthash.nXgSL1wj.dpuf.

According to the FDA, Aluminum may reach toxic levels with prolonged parenteral feeding . . . Research indicates that patients with impaired kidney function, including premature neonates [babies], who received parenteral levels of aluminum at greater than 4 to 5 micrograms per kilogram of body weight per day, accumulate aluminum at levels associated with central nervous system and bone toxicity. Tissue loading may occur at even lower rates of administration." Also, according to government documents, "Aluminum content in parenteral drug products could result in a toxic accumulation of aluminum in individuals receiving TPN therapy. Research indicates that neonates and patient populations with impaired kidney function may be at high risk of exposure to unsafe amounts of aluminum. Studies show that aluminum may accumulate in the bone, urine, and plasma of infants receiving TPN. Many drug products used in parenteral therapy may contain levels of aluminum sufficiently high to cause clinical manifestations . . . parenteral aluminum bypasses the protective mechanism of the GI tract and aluminum circulates and is deposited in human tissues. Aluminum toxicity is difficult to identify in infants because few reliable techniques are available to evaluate bone metabolism in . . . infants . . . Although aluminum toxicity is not commonly detected clinically, it can be serious in selected patient populations, such as neonates, and may be more common than is recognized.

From these documents we learn that if a premature baby receives more than 10 mcg per day of aluminum in an IV, it can accumulate in their bones and brain, and can be toxic.

The FDA's maximum requirements for aluminum received in an IV is 25 mcg per day. The suggested aluminum per kilogram of weight to give to a person is up to 5 mcg. Thus, a baby weighing five pounds should get no more than 11 mcg of aluminum.

Anything that has more than 25 mcg of aluminum per dose requires a label that says: "WARNING: This product contains aluminum that may be toxic. Aluminum may reach toxic levels with prolonged parenteral administration if kidney function is impaired. Premature neonates are particularly at risk because their kidneys are immature, and they require large amounts of calcium and phosphate solutions, which contain aluminum."

There is no requirement for vaccines to carry this label and also no requirement to limit the maximum dosage to 25 mcg. All vaccines exceed the maximum allowable aluminum per day for babies, toddlers and children. At birth, most children are given the hepatitis B vaccination. The amount of aluminum in the hepatitis B vaccine alone is almost fourteen times the amount of aluminum that is FDA-approved for an eight-pound baby.

At well-baby check-ups, it's common for two-month, four-month, and six-month appointments to include up to eight vaccinations, which add up to more than 1,000 mcg of aluminum. This amount isn't even safe for a 350-pound adult. And many children get up to eight vaccinations per visit several times a year. By eighteen months, fully vaccinated babies have received almost 5000 mcg (5 milligrams) of highly neurotoxic aluminum into the bloodstream.

The counter argument is that in parenteral feeding, all the aluminum goes instantaneously into the circulation, while in vaccines only a portion goes into the

circulatory system. Still, it is reasonable to question the safety of aluminum doses that are many times higher than those considered safe for parenteral feeding.

According to the FDA and the AAP (American Academy of Pediatrics), at more than the maximum required dose, aluminum builds up in the bones and brain and can be toxic. Aluminum can cause neurological harm, including cognitive impairment in healthy adults. Aluminum overdose can be fatal in patients with weak kidneys or kidney disorders or in premature babies. Could this be why the hepatitis B shot, given to infants at birth, has been linked to sudden infant death syndrome (SIDS)?

**Formaldehyde (embalming fluid):**

Formaldehyde is toxic and is known to cause cancer. The International Agency for Research on Cancer (IARC) classifies formaldehyde as a human carcinogen. In 2011, the National Toxicology Program, an interagency program of the Department of Health and Human Services, named formaldehyde as a known human carcinogen. In addition, 10-20 percent of the general population may be susceptible to formaldehyde allergies and may react acutely at any exposure level. Formaldehyde is oxidized to formic acid which leads to acidosis and nerve damage. Acidosis can be described as a condition in which the acidity of the body tissues and fluids is abnormally high. The liver and the kidneys may also be damaged.

**OSHA has warnings of exposure to humans to formaldehyde.**

Ingestion: Ingestion of as little as 30 ml of a 37 percent solution of formaldehyde (formalin) can result in death. Gastrointestinal toxicity after ingestion is most severe in the stomach and results in symptoms which can include nausea, vomiting, and severe abdominal pain. Diverse damage to other organ systems including the liver, kidney, spleen, pancreas, brain, and central nervous systems can occur from the acute response to ingestion of formaldehyde. Long term exposure to formaldehyde has been shown to be associated with an increased risk

of cancer of the nose and accessory sinuses, nasopharyngeal and oropharyngeal cancer, and lung cancer in humans. Animal experiments provide conclusive evidence of a causal relationship between nasal cancer in rats and formaldehyde exposure. Concordant evidence of carcinogenicity includes DNA binding, genotoxicity in short-term tests, and cytotoxic changes in the cells of the target organ suggesting both preneoplastic changes and a dose-rate effect. Formaldehyde is a complete carcinogen and appears to exert an effect on at least two stages of the carcinogenic process.

The California Department of Public Health as stated that "Overexposure to Formaldehyde irritates the eyes, nose, throat, and skin. Formaldehyde can cause allergic reactions of the skin (dermatitis) and the lungs (asthma). Formaldehyde is a known cause of cancer in humans." Reference: https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=8&cad=r ja&uact=8&ved=0ahUKEwjQpKyvrf3LAhVFsYMKHUV2DvsQFghPMAc&url =https%3A%2F%2Fwww.cdph.ca.gov%2Fprograms%2Fhesis%2FDocuments% 2Fformaldehyde.pdf&usg=AFQjCNE7Gk0Ej_LzQolPfZg6CLnSALRVSg&sig2 =ajmlghfcTjgQt9ZN3SXp0A.

**Mercury Thimerosol**

Thimerosal is a preservative containing approximately 50 percent mercury. Mercury is the second most poisonous element known to man (next to uranium and its derivatives). When someone says, "Mercury!" we immediately think of the news stories about the child at school who broke a thermometer in biology class and the hazmat team was called in. All the students were in peril. Hazmat teams are called in for less mercury than the amount contained in one vaccine. Thimerosal prevents bacteria growth in multi-use vaccines. It was removed from many vaccines in 2004—at which time more vaccines containing aluminum were added to the schedule, while mercury-laden flu vaccines were then recommended

for infants, and two years later for pregnant women, Mercury is also used in the vaccine creation process and then through a purification procedure it is purportedly "removed". However, in some vaccines, "trace" amounts are still left.

- See more at: http://www.westonaprice.org/health-topics/vaccination/adjuvants-in-vaccines/#sthash.nXgSL1wj.dpuf.

There are mounds of other data surrounding the side-affects and toxicity for these and the other above mentioned ingredients that could be compiled and listed here, but for the sake of brevity, that information will not be presented here. That information is well known to the public and the Defendants.

"A single vaccine given to a six-pound newborn is the equivalent of giving a 180-pound adult 30 vaccinations on the same day." Dr. Boyd Haley, Professor and Chair, Dept. of Chemistry, University of Kentucky (2001).

"If children receive all recommended vaccines, they will receive 2,370 times the "allowable safe limit" for mercury in the first two years of life (as if there is such a thing as a "safe" amount of a toxic poison). Yet, even after Congressional hearings instigated by Congressman Dan Burton (whose own grandchild became autistic after receiving vaccines) resulted in the FDA requesting (not ordering) vaccine manufacturers to remove this toxic heavy metal from their products, mercury is still present in many vaccines." Rebecca Carley, M.D.

"No batch of vaccine can be proved safe before it is given to children." Surgeon General of the United States Leonard Scheele, addressing an AMA convention in 1955.

"The only safe vaccine is a vaccine that is never used" Dr. James A. Shannon, National Institutes of Health.

1  "There is a great deal of evidence to prove that immunization of children does
2  more harm than good." Dr. J. Anthony Morris, formerly Chief Vaccine Control
3  Officer at the FDA.
4  Immunizations, as is forced upon all Americans as a "one size fits all" mandate is
5  a national scam. There **is** such a thing as "natural" immunity, based on good
6  food, good hygiene, indoor plumbing, excellent nutrition and breast feeding of
7  infants.  There is no conclusive evidence that vaccines have ever cured diseases
8  or saved the lives of Americans or protected the health of children in America.
9  The change in Americans' general health was due mostly to the implementation
10 of indoor plumbing, clean water, better hygiene, better nutrition, better foods, etc.
11 With the implementation of SB277, the Defendants have stripped away the
12 ability of parents to invoke their natural rights of self-preservation and or to opt
13 out of this criminal assault on their children's lives by being coerced, intimidated,
14 and forced into compliance under this dark cloud of medical and political
15 tyranny.
16      Plaintiffs, like thousands of others, have been deprived of their, liberty,
17 labor and certain inalienable rights protected by the United States Constitution by
18 the egregious actions of the Defendants.  The Defendants' actions have misused
19 the laws of California and the united States of America for their own special
20 interests.
21      Further, Plaintiffs are victims of extortion and oppression perpetrated by
22 the Defendants, and each of them, who have consistently and deliberately
23 attempted to overthrow the California and United States Constitutions in
24 violation of their oaths of office, which violates California and United States law
25 including the U.S. Constitution's Bill of Rights.
26      The Defendants are using Child Protective Services, local law,
27 enforcement agencies, public health agencies and the various California
28 Superintendent of Schools as their affiliates to intimidate, incarcerate and coerce

the people of California to comply with this unlawful, tyrannical bill. The Defendants have unlawfully used the California legislative process in furtherance of their objective to subject Californians to chemical and biological warfare for their own financial gain and profit. This "R.I.C.O." law suit documents a continuous pattern of violations of federally protected rights perpetrated against Plaintiffs and other California residents by Defendants and their known and unknown affiliates.

Defendants have engaged in a common enterprise, and common course of conduct, the purpose of which is and was to engage in the violations of law alleged in this Complaint. This common enterprise and common course of conduct continues to the present.

This lawsuit further attempts to report and provide evidence that the Defendants are operating the California Legislature like a *criminal enterprise* outside the confines of California and United States Law. The patterns of wrongs that are documented in this lawsuit have inflicted great harm upon Plaintiffs, the citizens of California, the United States and upon the rule of law.

Plaintiffs through this lawsuit seek damages and relief from these violations of numerous state and federally protected rights. Plaintiffs seek restitution imposing Civil Penalties, and granting all other relief provided for under California and United States Law against all named Defendants, jointly and severally for engaging in their unlawful and corrupt political practices.

## JURISDICTION

1. This action arises under the provisions of the Racketeering Influenced and Corrupt Organizations Act, Title 18 U.S.C. §§ 1961- 1964.

2. 18 U.S.C. § 1964(a) and (c)(a). The district courts of the United States shall have jurisdiction to prevent  and restrain violations of section 1962 of this

chapter by issuing orders including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise imposing reasonable restrictions on the future activities or investments of any person including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce or ordering dissolution or reorganization of any enterprise, making due provisions for the rights of innocent persons.

(C) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including reasonable attorney's fees.

3. 28 U.S.C. §§ 1343 and the First Amendment to the United States Constitution which provides for a *federal court forum* in which citizens may seek regress from the deprivation of rights, privileges, and immunities under color of state law.

4. 28 U.S.C. § 1331, the general federal question statute. 28 U.S.C. § 2201 and § 2202, the federal declaratory relief and injunctive relief statutes, to declare the rights of the parties.

5. 28 U.S.C. § 1332 (a)(1), diversity of jurisdiction of citizens of different states and the amount of controversy exceeds $75,000.00.

6. This Court may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Plaintiffs' state law claims for violations of The California Constitution Article 1 § 1 that guarantees all people the right to life, liberty, pursuing and obtaining safety, happiness, and privacy. And Article 1 § 4 of the California Constitution,  which provides that The Legislature shall make no law respecting an establishment of religion, as these claims are so related to the Plaintiffs' claims in the action within the original federal question

jurisdiction that it forms part of the same case or controversy under Article III of the United States Constitution.

7. The Constitution for the United States of America, all of the above statutes but not limited thereto.

8. This Incorporated Case is filed under the American Free Flag of peace of the united states of America and UCC 1-103.6. No jurisdiction under any American flags of war will be accepted in this Case Incorporation.

## VENUE

9. Venue of this Court is proper pursuant to Title 28 U.S.C. § 1391(a)(2), (b)(2), because the subject conduct of the defendants is based upon the wrongful acts and harm inflicted against the Plaintiffs by all Defendants complained of herein while Defendants where acting as Agents or Assigns of the People of, and or the State of California.

## PARTIES
### Plaintiffs

10. Plaintiff Travis Middleton, is a private citizen residing in the State of California at 27 West Anapamu Street No. 153 Santa Barbara, California 93101.

11. Plaintiff Eric Durak is a private citizen residing in the State of California at 133 Campo Vista Drive Santa Barbara, California 93111.

12. Plaintiff Jade Baxter is a private citizen residing in the State of California at 207 West Victoria Street Santa Barbara, California 93101.

13. Plaintiff Julianna Pearce is a private citizen residing in the State of California at 28780 My Way, Oneals, California 93645.

14. Plaintiff Candyce Estaves is a private citizen with a vaccine injured Son and daughter residing in the State of California at 430 East Rose

Avenue Santa Maria California 93454.

15. Plaintiff Denise Michelle Derusha is a private citizen residing in the State of California at 7125 Santa Ysabel Apt. 3 Atascadero, California 93422.

16. Plaintiff Melissa Christou is a private citizen residing in the State of California at 1522 knoll Circle Drive Santa Barbara, California 93101.

17. Plaintiff Andrea Lewis is a private citizen residing in the State of California at 1331 Santa Barbara St. # 10, Santa Barbra, California 93101.

18. Plaintiff Rachil Vincent is a private citizen residing in the State of California at 4320 Viua Presada, Santa Barbara, California 93110.

19. Plaintiff Jackie Kozak is a private citizen residing in the State of California at 1573 Lyndhvist Ave Camarillo, California 93010.

20. Plaintiff Don Demanlevesde is a private citizen residing in the State of California at 618 West Ortega Santa Barbara, California 93111.

21. Plaintiff Jessica Haas is a private citizen residing in the State of California at 2715 Verde Vista Santa Barbara, California 93105.

22. Plaintiff Paige Murphy is a private citizen residing in the State of California at 2230 Memory Lane West Lake Village, California 91361.

23. Plaintiff Christie Macias is a private citizen residing in the State of California at 618 West Ortega Santa Barbara, California 93101.

24. Plaintiff Lori Strantz is a private citizen residing in the State of California at 120 Barranca #B Santa Barbara, California 93109.

25. Plaintiff Anwanur Gielow is a private citizen residing in the State of California at 390 Park Street Buelton, California 93427.

26. Plaintiff Lisa Ostendorf is a private citizen residing in the State of California at 5459 Place Court, Santa Barbara, California 93111.

27. Plaintiff Julia Anne Whitney is a private citizen residing in the State of California at 55 Crestview Lane Montecito, California 93108.

30. Plaintiff Pam Corner is a private citizen residing in the State of California at

613 West Micheltorena Street, Santa Barbara, California 93101.

31. Plaintiff Jodie Trsserand is a private citizen residing in the State of California at 7697 Willow Glen Rd. Los Angeles, California 90046.

32. Plaintiff Alice Tropper is a private citizen residing in the State of California at 1805 Mountain Avenue Santa Barbara, California 93101.

33. Plaintiff Bret Nielsen is a private citizen residing in the State of California at 2230 Memory Lane West Lake Village, California 91361.

34. Plaintiff Brent Haas is a private citizen residing in the State of California at 2715 Verde Vista Santa Barbara, California 93105.

35. Plaintiff Murid Rosensweet is a private citizen residing in the State of California at 2230 Memory Lane West Lake Village, California 91361.

36. Plaintiff Andy Taft is a private citizen residing in the State of California at 1482 Menora Street Carpinteria, California 93103.

37. Plaintiff Marina Read is a private citizen residing in the State of California at 322 Pebble Beach Drive Goleta, California 93117.

## Defendants

**38.** Defendant Richard Pan, herein after ("Defendant Pan") is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol, Room 4070 Sacramento, CA 95814.

**39.** Defendant Win-Li Wang, herein after ("Defendant Wang") is and was at all times material in this complaint, the wife of Defendant Richard Pan, a private citizen doing business in the State of California with a business address of 4136 E. Commerce Way, Suite 100, Sacramento, California 95834.

**40.** Defendant Martin Jeffrey "Marty" Block, herein after ("Defendant Marty Block") is and was at all times material in this complaint a California legislator

within the State of California with a business address of the State Capitol, Room 4072 Sacramento, CA 95814.

**41.** Defendant Cindy Block, herein after ("Defendant Cindy Block") is and was at all times material in this complaint the wife of Defendant Martin "Marty" Block, a private citizen with a business address of the State Capitol, Room 4072 Sacramento, CA 95814.

**42.** Defendant Gerald A. "Jerry" Hill, herein after ("Defendant G. Hill") is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol, Room 5035 Sacramento, California 95814-4900.

**43.** Defendant Sky Hill, herein after ("Defendant Sky Hill") is and was at all times material in this complaint the wife of Defendant Gerald Hill, a private citizen with a business address of the State Capitol, Room 5035 Sacramento, California 95814-4900.

**44.** Defendant Holly Mitchell, herein after ("Defendant Mitchell") is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol, Room 5080, Sacramento, California 95814.

**45.** Defendant Catharine Baker, herein after ("Defendant Baker") is and was at all times material in this complaint a California legislator within the State of California with a business address of the Capitol Office, the State Capitol Sacramento, California 94249.

46. Defendant Dan Baker, herein after ("Defendant Dan Baker"), is and was at all times material in this complaint the spouse of Defendant Catharine Baker and a private citizen with a business address of the Capitol Office, the State Capitol Sacramento, California 94249.

47. Defendant Christina Garcia, herein after ("Defendant Garcia"), is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol P.O. Box 942849 Sacramento, California 94249-005858.

48. Defendant Adrin Nazarian, herein after ("Defendant Nazarian"), is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol Post Office Box 942849 Sacramento, California 94249-0046.

49. Defendant Diana Nazarian, herein after ("Defendant Diana Nazarian"), is and was at all times material in this complaint the wife of Defendant Adrin Nazarian and a private citizen with a business address of the State Capitol Post Office Box 942849 Sacramento, California 94249-0046.

50. Defendant Jim Wood, herein after ("Defendant Wood"), is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol P.O. Box 942849, Room 6005 Sacramento, California 94249-0002.

51. Defendant Jane Wood, herein after ("Defendant Jane Wood"), is and was at all times material in this complaint the wife of Defendant Jim Wood and a private

citizen with a business address of the State Capitol P.O. Box 942849, Room 6005 Sacramento, California 94249-0002.

**52.** Defendant Ben Allen, herein after ("Defendant Allen"), is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol, Room 2054 Sacramento, California 95814.

**53.** Defendant Kevin de Leon, herein after ("Defendant de Leon"), is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol, Room 205 Sacramento, California 95814.

**54.** Defendant Hannah-Beth Jackson, herein after ("Defendant Jackson"), is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol, Room 2032 Sacramento, California 95814.

**55.** Defendant George Eskin, herein after ("Defendant Eskin"), is and was at all times material in this complaint the spouse of Defendant Hannah-Beth Jackson with a business address of the State Capitol, Room 2032 Sacramento, California 95814.

**56.** Defendant Jeff Stone, herein after ("Defendant Stone"), is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol, Room 4062 Sacramento, California 95814.

**57.** Defendant Richard Bloom, herein after ("Defendant Bloom"), is and was at all times material in this complaint a California legislator within the State of California with a business address of Room 2003, State Capitol 1303 Tenth Street

Sacramento, California 9581468.

**58.** Defendant Robbie Black, herein after ("Defendant Black"), is and was at all times material in this complaint the wife of Defendant Richard Bloom with a business address of Room 2003, State Capitol 1303 Tenth Street Sacramento, California 9581468.

**59.** Defendant Bill Quirk, herein after ("Defendant Quirk"), is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol P.O. Box 942849 Sacramento, California 94249-0020.

**60.** Defendant Laurel Quirk, herein after ("Defendant Laurel Quirk"), is and was at all times material in this complaint the wife of Defendant Bill Quirk with a business address of the State Capitol P.O. Box 942849 Sacramento, California 94249-0020.

**61.** Defendant Lorena Gonzales, herein after ("Defendant Gonzales"), is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol P.O. Box 942849 Sacramento, California 94249-0080.

**62.** Defendant Reginald Jones-Sawyer, herein after ("Defendant Sawyer"), is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol P.O. Box 942849 Sacramento, California 94249-0059.

**63.** Defendant Isadore Hall, herein after ("Defendant Hall"), is and was at all times material in this complaint a California Legislator within the State of California with a business address of the State Capitol, Room 4085 Sacramento, California 95814.

**64.** Defendant Mark Leno, herein after ("Defendant Leno"), is and was at all times material in this complaint a California Legislator within the State of California with a business address of the State Capitol, Room 5100 Sacramento, California 95814-4900.

**65.** Defendant Douglas Jackson, herein after ("Defendant Jackson"), is and was at all times material in this complaint the spouse or life partner of Defendant Leno with a business address of the State Capitol, Room 5100 Sacramento, California 95814-4900.

**66.** Defendant Bob Wieckowski, herein after ("Defendant Wieckowski"), is and was at all times material in this complaint a California Legislator within the State of California with a business address of the State Capitol, Room 3086 Sacramento, California 95814.

**67.** Defendant Sue Lemke, herein after ("Defendant Lemke"), is as was at all times material in this complaint the spouse of Defendant Wieckowski with a business address of the State Capitol, Room 3086 Sacramento, California 95814.

**68.** Defendant David Chiu, herein after ("Defendant Chiu"), is and was at all times material in this complaint a California Legislator within the State of California with a business address of 2196 Legislative Office Building Sacramento, California 94249-0017.

**69.** Defendant Candace Chen, herein after ("Defendant Chen"), is and was at all times material in this complaint the spouse of Defendant David Chiu with a business address of 433 California Street, Suite 815 San Francisco, California 94104.

**70.** Defendant Evan Low, herein after ("Defendant Low"), is and was at all times material in this complaint a California Legislator within the State of California with a business address of the state capitol Room 2175 Sacramento, California 94249-0028.

**71.** Defendant Anthony Rendon, herein after ("Defendant Rendon"), is as was at all times material in this complaint a California Legislator within the State of California with a business address of Room 219 State Capitol 1303 Tenth Street Sacramento, California 95814.

**72.** Defendant Annie Lam herein after ("Defendant Lam"), is and was at all times material in this complaint the spouse of Defendant Rendon with a business address of Room 219 State Capitol 1303 Tenth Street Sacramento, California 95814.

**73.** Defendant Jim Beall, herein after ("Defendant Beall"), is as was at all times material in this complaint a California Legislator within the State of California with a business address of the State Capitol, Room 5066 Sacramento, California 95814.

**74.** Defendant Pat Lafkas, herein after ("Defendant Lafkas"), is and was at all times material in this complaint the spouse of Defendant Beall with a business address of the State Capitol, Room 5066 Sacramento, California 95814.

**75.** Defendant Robert Hertzberg, herein after ("Defendant Hertzberg"), is as was at all times material in this complaint a California Legislator within the State of California with a business address of the State Capitol, Room 4038 Sacramento, California 95814.

**76.** Defendant Mike McGuire, herein after ("Defendant McGuire"), is as was at all times material in this complaint a California Legislator within the State of California with a business address of the State Capitol 1303 10th Street, Room 5064 Sacramento, California 95814.

**77.** Defendant Erika McGuire, herein after ("Defendant Erika McGuire"), is as was at all times material in this complaint the spouse of Defendant Mike McGuire with a business address of the State Capitol 1303 10th Street, Room 5064 Sacramento, California 95814.

**78.** Defendant Lois Wolk, herein after ("Defendant Lois Wolk"), is and was at all times material in this complaint a California Legislator within the State of California with a business address of the State Capitol, Room 5114 Sacramento, California 95814.

**79.** Defendant Bruce Wolk, herein after ("Defendant Bruce Wolk"), is and was at all times material in this complaint the spouse of Defendant Lois Walk with a business address of the U.C. Davis Law School, 1 Shields Ave, Davis, California 95616.

**80.** Defendant Jim Cooper, herein after ("Defendant Cooper"), is and was at all times material in this complaint a California Legislator within the State of California with a business address of the State Capitol Post Office Box 942849 Room 5158 Sacramento, California 95814.

1

2    **81.** Defendant Kristen Cooper, herein after ("Defendant Kristen Cooper"), is as

3    was at all times material in this complaint the spouse of Defendant Jim Cooper

4    with a business address of the State Capitol Post Office Box 942849 Room 5158

5    Sacramento, California 95814.

6

7    **82.** Defendant Kevin McCarthy, herein after ("Defendant McCarthy"), is and was

8    at all times material in this complaint a California Legislator within the State of

9    California with a business address of 4100 Empire Drive Suite 150 Bakersfield,

10    California 93309.

11

12    **83.** Defendant Judy McCarthy, herein after ("Defendant Judy McCarthy"), is and

13    was at all times material in this complaint the spouse of Defendant Kevin

14    McCarthy with a business address of 4100 Empire Drive Suite 150 Bakersfield,

15    California 93309.

16

17    **84.** Defendant Mark Stone, herein after ("Defendant Mark Stone"), is and was

18    all times material in this complaint a California Legislator within the State of

19    California with a business address of the State Capitol, Room 5155, 1303 Tenth

20    Street Sacramento, California 95814 95.

21

22    **85.** Defendant Kathy Stone, herein after ("Defendant Kathy Stone"), is and was at

23    all times material in this complaint the spouse of Defendant Mark Stone with a

24    business address of the State Capitol, Room 5155, 1303 Tenth Street Sacramento,

25    California 95814 95.

26

27    **86.** Defendant Edmund Gerald "Jerry" Brown, Jr., herein after ("Defendant

28    Brown") is and was at all times mentioned in this complaint the governor of the

State of California with a business address of the State Capitol, suite 1173 Sacramento, California 95814.

**87.** Defendant Anne Gust, herein after ("Defendant Gust") is and was at all times mentioned in this complaint the wife of Defendant Jerry Brown with a business address of the State Capitol, suite 1173 Sacramento, California 95814.

**88.** Defendant the STATE OF CALIFORNIA, herein after ("Defendant CALIFORNIA") is and was at all times mentioned in this complaint a corporate fiction with a business address of 1300 "I" Street Sacramento, California 95814-2919.

**89.** Plaintiffs are informed and believe, and based thereon allege, that at all times relevant herein, each Defendant, regardless of how named was designated, the Agent, Assign, Servant, and/or Employee of each and every other Defendant, and at all times relevant herein was acting within the purpose, scope, and course of said Agency, Assignment, Service and Employment, with the express and/or implied knowledge, permission, and consent of the remaining Defendants, and each of the said Defendants ratified and approved the acts of each such Defendants.

**90.** The Plaintiffs are informed and believe, and on that basis allege, that the Defendants, and each of them, were, at all relevant times acting within the purpose and scope of said agency and employment, and that each Defendant has ratified and approved the acts of its agents. The allegations of the Complaint stated on information and belief are likely to have Evidentiary Support, after a reasonable opportunity for further Investigation and Discovery.

## FACTS APPPLICABLE TO ALL CLAIMS FOR RELIEF

**91.**   *"In around December 2014, it was reported that at least 40 visitors of Disneyland contracted measles at the park between December 17–20, 2014, triggering an outbreak, especially due to the presence of intentionally unvaccinated individuals. The likely "patient zero" was speculated to be an international visitor to the park".*   Source, *WikiPedia.com.*

**92.**   This is the so-called reason that spawned the vaccine bill SB277 authored by Defendants Richard Pan, Ben Allen and Lorena Gonzales.

   Quoting the L.A. Times: *"Although epidemiologists have not yet identified the person who brought measles to Disneyland, a new analysis shows that the highly contagious disease has spread to seven states and two other countries thanks to parents who declined to vaccinate their children".*

**93.**   This statement is a total fabrication. Given the fact that the health officials have yet to properly identify the infected person who purportedly visited Disneyland, there is no way of determining how, where or who these alleged recipients contracted the measles from in the first place. Additionally, if the health officials have failed to identify the person who started the original infection, then it would by next to impossible to determine not only where this infamous person has been, where they've since traveled and how many others may or may not have come into contact with him or her. In any event, the infected people were identified and properly quarantined and treated.  This seems hardly a need for a mandatory vaccine bill for all Californians.

**94.**   If the other news sources are correct in that this person was from another country, how and why does this fact even remotely suggest that American parents who chose not to vaccinate "their" children (which according to California Health

officials make up only 2.5% of the populace), are somehow responsible for this so-called outbreak? Such a claim is dubious at best. There is no plausible scientific or other kind of evidence to support this nonsensical view. According to the CDC, *"Measles can be prevented with the MMR (measles, mumps, and rubella) vaccine. One dose of MMR vaccine is about 93% effective at preventing measles if exposed to the virus, and two doses are about 97% effective. In the United States, widespread use of measles vaccine has led to a greater than 99% reduction in measles cases compared with the pre-vaccine era. Since 2000, when measles was declared eliminated from the U.S., the annual number of people reported to have measles ranged from a low of 37 people in 2004 to a high of 668 people in 2014. Most of these originated outside the country or were linked to a case that originated outside the country"*.

**95.** If the statistics from the CDC are true that the measles vaccine is 93% to 97% effective in preventing measles, and the measles have already been declared eliminated in the United States since 2000, then even if 37 people in 2004 and 668 people in 2014 came down with measles, these numbers are still extremely small compared to the number of people living in the United States which is around 323 million, 394 thousand people. California has nearly 39 million people. Out of 39 million people, 30 to 40 infected people who got adequate medical care does not constitute an outbreak. And, according to the CDC, if the MMR vaccine is 93% to 97% effective, then why and how did some of the vaccinated people who were exposed acquire the measles? This narrative by the CDC officials is pure fiction. Additionally, there is no evidence that unvaccinated children can infect people with diseases that they do not have. And, if the measles have been determined to

have been eliminated from the U.S. which has estimated well over 323 million people, then in light of these numbers the whole Disneyland event is just another contradiction and falsehood.

**96.**  Also, how is it possible for the officials to make a determination of the cause and origin of the other purported seven states with infectious people? One could argue that these events are not related at all to the Disneyland event.

*"Based on historical data, infectious disease experts know that in the absence of any vaccination, a single person infected with measles can spread it to between 11 and 18 other people. They also know that it takes 10 to 14 days for one measles case to lead to another".* -L.A. Times.

**97.**  If this statement is true, then there is at least a ten-day to two week period of time that will pass before any person who comes into contact with anyone infected with the measles will show any symptoms. The possibilities are endless as to how many places and people a person may come into contact with once infected. There is no way of certainty to determine where a person was infected and who infected them. Since the daily attendance at Disneyland is somewhere between 40 to 50,000 people, why didn't more people get infected? This whole measles outbreak narrative is simply beyond preposterous.

*"The index patient in the 3-month-old Disneyland outbreak was probably exposed to the measles overseas and then visited the Anaheim amusement park while contagious, according to the Centers for Disease Control and Prevention. This particular strain of measles is identical to one that spread through the Philippines last year, where it sickened about 58,000 people and killed 110. No deaths have been traced to the Disneyland outbreak".* http://www.latimes.com/science/sciencenow/la-sci-sn-disneyland-measles-under-vaccination-20150316-story.html.  But this was in the Philippines, not the U.S.

**98.** In reading the above quote from the L.A. Times article where it is purported that:

*"the "3-month-old Disneyland outbreak was probably exposed to the measles overseas and then visited the Anaheim amusement park while contagious.....This particular strain of measles is identical to the one that spread through the Philippines last year, where it sickened about 58,000 people and killed 110".*

**99.** Again, since the Center for Disease Control has seemingly already admitted that this strain of measles is identical to the one that spread throughout the Philippines last year where it sickened about 58,000 people and killed 110, one could conclude either that all of California's parents who refuses to vaccinate their children (or at least some of them-the 2.5 %) were in the Philippines at this same time last year to become exposed to and contract this strain of measles and only a few of these parents or kids showed up at Disneyland to infect others. But, if that were the case these same Americans and their children would have already been treated for the disease either while in the Philippines or shortly after they returned to the States. This narrative suggests that the CDC is also accusing both the unvaccinated children along with the unidentified person as the cause of the Disneyland event both at the same time, thus making this narrative a fabrication larger than Yosemite National Park.

**100.** It has been over a year since the outbreak in the Philippines, so to put the blame on the parents who refuses to vaccinate their children is totally bogus and without merit. Or, did this infamous "patient zero" cause this infectious event? But, again this individual has yet to be identified so it is unlikely that the CDC can point the finger at this "ghost" either. More likely than not, there is no "patient zero". This fictitious person is a creation of the Defendants to assist them in their attempt to legitimize the Measles event at Disneyland and to further pass unlawful and unconstitutional legislation known as SB277 and other bills like it.

**101.**   In view of these severe discrepancies and falsehoods in the official reports of this Disneyland measles event, one could conclude that the whole event is a hoax on a grand scale and that the Defendants and their P.R. people should learn to lie better.

## The Lies Corruption and Deceit Continues on The Floor of The Legislature

**102.**   The Sacramento Bee reports; "The bill heads to the Senate Judiciary Committee, the next step in a potentially long odyssey winding through several committees and floor votes in both the Assembly and Senate. Every Democrat on the Judiciary Committee is either a co-sponsor of the bill or has voted for it."
As the committee chair, Carol Liu, offered Senator Pan an extra week due to the bill's imminent demise, Defendant Pan was caught on camera receiving his orders from lobbyists Jodi Hicks and Janus Norman. The senator has former working ties to both. This is an extreme conflict of interest.

**103.**   According to an article from 2014 in the Sacramento Bee:
"As a UC Davis pediatrician, Pan was an active member of the group that lobbies for doctors in the Capitol, known as the California Medical Association. Jodi Hicks was the association's chief lobbyist. … and is a partner in a Sacramento lobbying firm called DiMare, Brown, Hicks & Kessler. She routinely seeks Pan's votes as she lobbies for clients that include associations representing family physicians, eye doctors and podiatrists. Those three groups have together given more than $20,000 to Pan's campaign."

**104.**   Hicks daughter, Seneca, appeared in Defendant Pan's campaign commercials. Hicks said about her daughter Seneca appearing in Defendant Pan's campaign commercials, "I don't think anyone other than a few of us here in

Sacramento know it's a lobbyist's daughter." Interestingly enough, Jodi Hicks now works for DiMare, Brown, Hicks & Kessler, LLC (DBHK) and was named Capitol Weekly's "Top 100", an annual ranking of the most powerful players in California politics. It is my opinion that Ms. Hicks is near the top of a dubious, stinking pile of corruption.

**105.** Defendants Pan, Allen and Gonzalez then colluded and conspired with Jodi Hicks and other lobbyist to encourage the other Defendant legislators through monetary compensation to join in, support and pass SB277.

**106.**                 **TOP DRUG MAKER DONORS**

State records show that pharmaceutical companies and trade groups donated more than $2 million to current lawmakers in 2013-2014.

| Pharmaceutical company or group | Campaign donations to current state legislators | Direct lobbying payments |
|---|---|---|
| Johnson & Johnson Inc. | $86,300 | $583,926 |
| GlaxoSmithKline | $32,250 | $561,479 |
| Eli Lilly & Company | $193,100 | $280,863 |
| Gilead Sciences Inc. | $77,600 | $196,732 |
| Biocom PAC | $30,000 | $223,224 |
| Sanofi | $48,000 | $172,500 |
| Abbott Laboratories | $173,600 | $42,500 |
| Astellas Pharma US Inc. | $47,900 | $161,440 |
| AstraZeneca Pharmaceuticals LLP | $157,300 | $49,583 |
| Merck & Co. Inc. | $91,600 | $108,204 |
| California Pharmacists Association | $53,389 | $134,176 |

| Pharmaceutical Research & Manufacturers Assn. | $137,950 | $45,455 |
|---|---|---|
| Eisai Inc. | $92,000 | $88,000 |
| Bristol-Myers Squibb Company | $32,300 | $144,101 |
| Pfizer | $150,600 | $21,250 |
| AbbVie | $138,425 | $25,530 |
| Amgen | $105,600 | $45,455 |
| Allergan USA Inc. | $120,100 | $22,757 |
| Takeda Pharmaceuticals USA Inc. | $40,000 | $83,348 |
| Pharmacy Professionals of California | $32,000 | $0 |

## TOP DRUG MAKER RECIPIENTS

| Lawmaker | Party/District | Amount |
|---|---|---|
| Sen. Richard Pan* | D-Sacramento | $95,150 |
| Assembly Speaker Toni Atkins | D-San Diego | $90,250 |
| Sen. Ed Hernandez* | D-Azusa | $67,750 |
| Sen. Holly Mitchell* | D-Los Angeles | $60,107 |
| Assemblyman Brian Maienschein* | R-San Diego | $59,879 |
| Senate President Pro Tem Kevin de León | D-Los Angeles | $56,648 |
| Sen. Isadore Hall | D-Compton | $52,400 |
| Sen. Jerry Hill | D-San Mateo | $50,209 |
| Assemblyman Henry Perea | D-Fresno | $49,550 |
| Assemblywoman Shirley Weber | D-San Diego | $47,000 |
| Assemblyman Mike Gatto | D-Los Angeles | $46,491 |
| Assemblywoman Susan A. Bonilla* | D-Concord | $45,600 |
| Sen. Andy Vidak | R-Hanford | $42,800 |
| Assemblyman Tom Daly | D-Anaheim | $40,300 |
| Assemblyman Kevin Mullin | D-South San Francisco | $38,400 |
| Assemblyman Adam Gray | D-Merced | $37,000 |

| Assemblyman Rob Bonta* | D-Alameda | $36,750 |
| Assemblyman Anthony Rendon | D-Lakewood | $36,200 |
| Assemblyman Jimmy Gomez* | D-Los Angeles | $33,850 |
| Assemblyman Richard Gordon | D-Menlo Park | $33,100 |

*Member of the Assembly or Senate health committees

Source: Bee analysis of secretary of state campaign finance and lobbying reports.

**107.**  Pharmaceutical companies and their trade groups gave more than $2 million to current members of the Legislature in 2013-2014, about 2 percent of the total raised, records show. Nine of the top 20 recipients are either legislative leaders or serve on either the Assembly or Senate health committees. Receiving more than $95,000, the top recipient of industry campaign cash is Defendant Sen. Richard Pan, a Sacramento Democrat and doctor who is carrying the vaccine bill.

**108.**  In addition, the industry donated more than $500,000 to outside campaign spending groups that helped elect some current members last year. Leading pharmaceutical companies also spent nearly $3 million more during the 2013-2014 legislative sessions lobbying the Legislature, the governor, the state pharmacists' board and other agencies, according to state filings. In short, the Defendant legislators, including Defendant Gerald Brown where bought and paid for by the drug companies to corruptly influence the outcome of the votes to pass SB277. All one has to do is follow the money trail.

**109.**  All of the corruption of the Defendant legislators in passing SB277 is underscored by the criminal fraud and corruption being perpetrated by the Center for Disease Control (CDC) with respect to the efficacy of the MMR and other vaccines. Despite this fact the CDC has and is still standing on their claims that all vaccines are safe, effective and needed by our society. This is yet another bright

and shining lie motivated around politicians and the drug cartels' financial incentives to keep getting richer at the expense of the health and well-being of Plaintiffs' offspring. Meanwhile the Vaccine Court in New York has paid out 3.2 billion dollars in settlements for vaccine injured plaintiffs.  Just taking into account the amount of pay-outs given to citizens who've been injured from vaccinations is enough proof that vaccines are not safe and not effective.

**The CDC And Merck Has Come Under Fire Due To Corruption and Fraud**

**110.**  In a recent article written by the Huffington Post on 9/25/2014:

"Merck, the pharmaceutical giant, is facing a slew of controversies over its Measles-Mumps-Rubella (MMR) vaccine following numerous allegations of wrongdoing from different parties in the medical field, including two former Merck scientists-turned-whistleblowers. A third whistleblower, this one a scientist at the Centers for Disease Control, also promises to bring Merck grief following his confession of misconduct involving the same MMR vaccine.

The controversies will find Merck defending itself and its vaccine in at least two federal court cases after a U.S. District judge earlier this month threw out Merck's attempts at dismissal. Merck now faces federal charges of fraud from the whistleblowers, a vaccine competitor and doctors in New Jersey and New York. Merck could also need to defend itself in Congress: The staff of representative Bill Posey (R-Fla) -- a longstanding critic of the CDC interested in an alleged link between vaccines and autism -- is now reviewing some 1,000 documents that the CDC whistleblower turned over to them.

The first court case, United States v. Merck & Co., stems from claims by two former Merck scientists that Merck "fraudulently misled the government and

omitted, concealed, and adulterated material information regarding the efficacy of its mumps vaccine in violation of the FCA [False Claims Act]."

According to the whistleblowers' court documents, Merck's misconduct was far-ranging: It "failed to disclose that its mumps vaccine was not as effective as Merck represented, (ii) used improper testing techniques, (iii) manipulated testing methodology, (iv) abandoned undesirable test results, (v) falsified test data, (vi) failed to adequately investigate and report the diminished efficacy of its mumps vaccine, (vii) falsely verified that each manufacturing lot of mumps vaccine would be as effective as identified in the labeling, (viii) falsely certified the accuracy of applications filed with the FDA, (ix) falsely certified compliance with the terms of the CDC purchase contract, (x) engaged in the fraud and concealment describe herein for the purpose of illegally monopolizing the U.S. market for mumps vaccine, (xi) mislabeled, misbranded, and falsely certified its mumps vaccine, and (xii) engaged in the other acts described herein to conceal the diminished efficacy of the vaccine the government was purchasing."

These fraudulent activities, say the whistleblowers, were designed to produce test results that would meet the FDA's requirement that the mumps vaccine was 95 per cent effective. To the whistleblowers' delight, the judge dismissed Merck's objections to the case proceeding, finding the whistleblowers had plausible grounds on all of the claims lodged against Merck.

If the whistleblowers win, it would represent more than a moral victory (they repeatedly tried to stop Merck while still in its employ). Under the False Claims Act, the whistleblowers would receive a share -- likely 25 per cent to 30 per cent -- of the amount the government recovers. Previous settlements involving extensive fraud by pharmaceutical companies under the False Claims Act have run into the

hundreds of millions of dollars, and in some cases such as against GlaxoSmithKline and Pfizer, into the <u>billions</u>.

The second court case, <u>Chatom Primary Care v. Merck & Co</u>. relies on the same whistleblower evidence. This class action suit claims damages because Merck had fraudulently monopolized the mumps market. Doctors and medical practices in the suit would be able to obtain compensation for having been sold an overpriced monopolized product, and a defective one to boot, in that the mumps vaccine wasn't effective (indeed, the suit alleged that <u>Merck expected outbreaks to occur</u> and, as predicted, they did -- mumps epidemics occurred in 2006 in a highly vaccinated population and again in 2009-2010).

"Plaintiffs have argued sufficient facts to sustain a claim for proximate causation, detailing the significant barriers that other companies would face to enter the mumps vaccine market," the court ruled.

"The third whistleblower -- a senior CDC scientist named William Thompson -- only indirectly blew the whistle on Merck. He more blew it on himself and colleagues at the CDC who participated in a 2004 study involving the MMR vaccine. Here, the allegations involve a cover-up of data pointing to high rates of autism in African-American boys after they were vaccinated with MMR. In what could be high-profile House hearings before Congressman Posey's Science Committee -- hearings made all the more explosive given the introduction of race into the mix -- Merck could find itself under unprecedented scrutiny. The <u>CDC still stands by its study</u> although Frank DeStefano, the CDC's Director of Immunization Safety and a co-author in the CDC study, also stated that <u>he plans to review his notes</u> with an eye to reanalyzing the data. Some say all publicity is good. In Merck's case, regardless of the ultimate merits, the publicity will be all bad."

*-Huffington Post.*

**111.**   The Defendants Pan, Allen, Gonzalez and the other Defendant legislators knew before hand of these lawsuits and were aware of the harmful heavy metals inside these vaccines long before the house and senate hearings on SB277.  The Defendant legislators were at this point already paid off by the lobbyist from the pharmaceutical cartels and did not care about their lawful duty to do the right thing under the law as required by their oaths.

## Defendants' Ongoing, Open-Ended Pattern of Racketeering Activity

**112.**   On information and belief, in furtherance of their racketeering scheme the Defendant legislators routinely engaged in unlawful service and duties to their offices and to the citizens they purport to represent by accepting bribes in the form of money and other considerations from drug company lobbyists to pass legislation that extorts the rights of the citizens of California for the Defendants' own financial gain and profit. For purposes of this section, generic description of "bribery" is conduct which is intended, at least by the alleged briber, as an assault on the integrity of a public office or an official action. U.S. v. Forsythe, C.A.3 (Pa.) 1977, 560 F.2d 1127.

**113.**   On information and belief, in furtherance of their racketeering scheme Defendant legislators routinely violate their Oaths of office which mandates that they support and defend the California and United States constitutions, including the Bill of Rights, from all enemies foreign and domestic, especially with respect to any law making activities affecting the liberties of the citizens of the state of California whom they purport to represent. The Defendant legislators willfully,

wantonly and recklessly violated their oaths to the California and U.S. constitutions by passing SB277.

**114.** Further, on information and belief, in furtherance of their racketeering scheme Defendant legislators routinely have meetings on the house floor and senate to give the public the illusion that legitimate democratic processes are at work within the procedures and hearings of the state capitol building, when in fact Defendants collude and conspire with one another in conducting secret meetings behind closed doors before and afterwards to corruptly influence the outcome of the passage of certain bills for their own financial gain and profit, all while extorting the liberty and freedoms of Plaintiffs and other California residents.

**115.** On information and belief, in furtherance of their racketeering scheme Defendant legislators routinely collude and conspire with one another to use the house and senate hearings at the state capital as their conduit and venue to extort the liberty and certain rights of Plaintiffs and other California citizens of their property, money and liberty by sham, oppressive legislation like SB277 and other similar bills.

**116.** On information and belief, in furtherance of their racketeering scheme Defendant legislators' receive the financial benefit of their corrupt activities through their salaries and pensions which are all directly or indirectly derived from the activities of their standard pay which is over $97,000 per annum plus the illegal contributions and bribes from the drug companies and their lobbyist while in office.

**117.** On information and belief, in furtherance of their racketeering scheme, Co-conspirators Defendant legislators' spouses have conspired to aid, abet, encourage

and supported the Defendant legislators in their corrupt and criminal enterprises while receiving the financial benefit of their public officials' corrupt activities. These Defendant spouses and Co-conspirators are, Win-Li Wang, Cindy Block, Sky Hill, Dan Baker, Diana Nazarian, Jane Wood, George Eskin, Robbie Black, Laurel Quirk, Douglas Jackson, Sue Lemke, Candace Chen, Annie Lam, Pat Lafkas, Erika McGuire, Bruce Wolk, Kristen Cooper, Judy McCarthy, Kathy Stone and Anne Gust.

### Defendants' Predicate Acts of Obstruction of Justice & Conspiracy to Obstruct Justice

**118.** Defendant legislators, including Defendant Edmund Brown on behalf of the Defendant State of California, have conspired with, aided, abetted, colluded and agreed with one another to engage in a continuous pattern of racketeering activity as defined in 18 U.S.C. § 1961 Subsection 1503, in that they have engaged in two or more predicate acts of Obstruction of Justice within the preceding two years using the California Legislature as a conduit as described herein.

**119.** Defendant legislators conspired and colluded with one another and agreed to join the conspiracy, agreed to commit predicate acts (breach or perjury of their oaths), and knew that those acts were part of a pattern of racketeering activity. Each and every Defendant legislator agreed to participate in the conduct of the affairs of the criminal enterprise through a pattern of racketeering activity, and further engaged in a conspiracy to pervert or obstruct justice with the intent to corruptly influence the outcome of the state legislative law making process on the floor of the house and senate hearings in violation of 18 U.S.C. § 1962(d)). All of the above mentioned predicate acts committed by the Defendant legislators were condoned and sanctioned by the Defendant State of California.

**120.**  The predicate act of Obstruction of Justice, 18 U.S.C. §1503 provides:

-Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States (the State of California is enjoined and incorporated into the United States as an agency and or subsidiary by and through the 14th Amendment) , or the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress.

-  Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede…… or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b).

(b) The punishment for an offense under this section is—

(1) In the case of a killing, the punishment provided in sections 1111 and 1112;

(2) In the case of an attempted killing, or a case in which the offense was committed against a petit juror and in which a class A or B felony was charged, imprisonment for not more than 20 years, a fine under this title, or both; and

**(3) In any other case, imprisonment for not more than 10 years, a fine under this title, or both.**

### FIRST CLAIM FOR RELIEF FOR VIOLATION OF THE RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") 18 U.S.C. § 1961
**(By Plaintiffs Against All Defendants)**

**121.** Plaintiffs reallege and incorporate in this First Claim for Relief each and every allegation set forth above as though fully set forth herein.

**122.** A "R.I.C.O." enterprise may include courts. *United States v. Angelilli*, 660 F.2d 23 (2nd Cir. 1981). (See *United States v. Thompson*, 685 F.2d 993 (6thCir.1982), alleging that governor's office in Tennessee was a criminal enterprise.) See also *United States v. Stratton*, 649 F.2d 1066 (1981) alleging that Florida's Third Judicial Circuit met the requisite of a "RICO" enterprise; *United States v. Clark*, 646 F.2d1259 (8th Cir. 1981), holding that a governmental agency can be a RICO enterprise, and listed several, including examples: the office of county judge to be an enterprise under the "RICO" Act and any other government agencies or offices; *United States v. Altomare*, 625 F.2d 5, 7, n.7 (4th Cir. 1980), the office of county prosecutor; *United States v. Grzywacz*, 603 F.2d 682, 686 (7th Cir.1979), the city police department. Among the government units that have been held to be" enterprises" are offices of **governors** and <u>state legislators</u>, courts and court clerks' offices. See e.g., *United States v. Stratton*, 649 F.2d 1066, 1072-75 (5th Cir. 1981);

**123.** The "R.I.C.O." enterprise described herein consists of all the named Defendants: Richard Pan, Win-Li Wang, Martin Jeffrey "Marty" Block,  Cindy Block,  Gerald A. "Jerry" Hill,  Sky Hill, Holly Mitchell, Catharine Baker, Dan Baker,  Christina Garcia, Adrin Nazarian, Diana Nazarian, Jim Wood, Jane Wood, Ben Allen, Kevin de Leon, Hannah-Beth Jackson, George Eskin, Jeff Stone, Richard Bloom, Robbie Black, Bill Quirk, Laurel Quirk, Lorena Gonzalez, Reginald Jones-Sawyer, Isadore Hall, Mark Leno, Douglas Jackson, Bob Wieckowski, Sue Lemke, David Chiu, Candace Chen, Evan Low, Anthony Rendon, Annie Lam, Jim Beall, Robert Hertzberg, Mike McGuire, Erika McGuire, Lois Wolk, Bruce Wolk, Jim Cooper, Kristen Cooper, Kevin

McCarthy, Judy McCarthy, Mark Stone, Kathy Stone, Edmund G. Brown Jr., Anne Gust and The State of California.

**124.** At all relevant times herein, all Defendants and the Co-conspirators were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(4).

**125.** At all relevant times herein, Defendants and Co-conspirators formed an association-in-fact for the specific purpose of extorting the constitutional rights of Plaintiffs, their school-age offspring and those similarly situated as such rights are guaranteed and secured by the First Amendment (right of deeply held spiritual beliefs in rejecting having certain animal and or human tissues or poisonous chemicals forced into their offspring's bodies; the rights of parents to choose a particular medical procedure with respect to their offspring whether born or unborn; the right to informed consent over a medical procedure regarding their offspring); and, by the Fourth Amendment (the right of privacy and to be let alone by government, or anyone or any agency acting on government's behalf); and, by the Fifth Amendment (the right not to be assaulted, maimed or killed with a needle filled with poisonous substances without due process of law, or the right not to lose their life, health, well-being or liberty without due process of law); and, by the Ninth Amendment (the fundamental and common law right of life, liberty, and right to protect the life, health, well-being and liberty of their offspring); and, by the Fourteenth Amendment (the right of due process of law before any rights may be taken away, and the equal protection of ALL laws state and federal including but not limited to the right to opt out of any tyrannical governmental medical experiment or treatment.

**126.** This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

127. At all relevant times herein, this "law" making enterprise was engaged in, and its activities affected interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1961 (Sec. 1951).

128. At all relevant times herein, all Defendants and other Co-conspirators associated with this enterprise conducted or participated directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961 (Sec. 1952), in violation of RICO, 18 U.S.C. § 1961 & 1962(C) and as alleged in paragraphs 98 through 134 above.

129. 18 U.S.C. § 1961 provides in pertinent parts:
(1). "racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: Section 201 (relating to bribery), section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), section 1344 (relating to financial institution fraud), section 1503 (relating to obstruction of justice), section 1512 (relating to tampering with a witness, victim, or an informant), section 1513 (relating to retaliating against a witness, victim, or an informant), section 1951 (relating to interference with commerce, robbery, or extortion), section 1952 (relating to racketeering), 1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire), sections 175–178 (relating to biological weapons), sections 229–229F (relating to chemical weapons).

**130.** Specifically, at all relevant times herein, Defendant legislators and other Co-conspirators engaged in "racketeering activity" within the meaning of 18 U.S.C. § 1961(1) by engaging in Obstruction of Justice in violation of 18 U.S.C. § 1503 by corruptly influencing the outcome of the house and senate hearings to pass bill SB277; and, Perjury of their Oaths to the California and U.S. Constitutions resulting in treason and Seditious Conspiracy to overthrow the state and federal Constitutions; and further engaged in a Conspiracy to Obstruct Justice in violation of 18 U.S.C. § 1951 relating to interference with commerce, robbery, or extortion; and, further engaged in a Conspiracy to Racketeer in violation of section 1951 of section 1961 and 1962(d).

**131. Extortion of Plaintiffs' Liberty-** A conviction for extortion within the meaning of the Hobbs Act requires that the Defendants obtained "property" or "liberty" from another, with his consent, induced by wrongful use of actual or threatened force, or fear, or under color of official right. 18 U.S.C. § 1503.

**132.** In furtherance of their racketeering and extortion scheme, the Defendants have used their offices, positions, influence, affiliates and sub agencies including but not limited to the Superintendent of Schools, the County Health Departments, local law enforcement, Child Protective Services and health care providers to threaten, intimidate, coerce and or incarcerate Plaintiffs (the parents of unvaccinated or partially vaccinated offspring) for bogus criminal charges including, Parental Negligence, Child Endangerment, Truancy, etc. should they fail to comply with Defendants' unconstitutional bill.

**133.** The acts set forth above constitute a violation of one or more of the prohibited overt acts under 18 U.S.C. §1961 and 18 U.S.C. § 1962(c). All the

Defendants and the other Co-conspirators each committed and/or aided and abetted the commission of two or more of these acts of racketeering activity.

134.   The acts of racketeering activity referred to in the previous paragraphs constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5). The acts alleged were related to each other by virtue of common participates (all named Defendants), a common victim (Plaintiffs, Plaintiffs' offspring and others similarly situated), a common method of commission (closed door meetings and perjury of their oaths), and the common purpose and common result of extorting the constitutional rights of Plaintiffs and others similarly situated depriving said Plaintiffs or class of persons of equal protection of the laws or equal privileges and immunities under the law. The Defendant legislators and other Co-conspirators did commit the overt acts as alleged in this complaint in furtherance of conspiracy to the injury of Plaintiffs' person or property and deprived Plaintiffs of Plaintiffs' rights and or privileges as citizens of the united States America.

135.   The Obstruction of Justice and Extortion of Rights scheme being committed by the Defendants have continued for over two years and threatens to continue despite the institution of this Complaint.

136.   As a result of Defendants and the other Co-conspirators' violations of 18 U.S.C. § 1961 & 1962(c), Plaintiffs have lost a substantial amount of their time, money, labor and constitutional freedoms as a result of the racketeering activities conducted in the fraudulent bill passing scheme and as part of the prohibited activities herein alleged.

**137.** As a result of their racketeering enterprise, Defendants are liable to the Plaintiffs for their losses in an amount to be determined at trial.

**138.** Pursuant to RICO, 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold their damages plus costs from Defendants. The Defendants' acquisition, control and interest in this RICO enterprise were the proximate cause of damages and injury to Plaintiffs.

## SECOND CLAIM FOR RELIEF FOR VIOLATION OF THE RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") 18 U.S.C. § 1962(a)(d), CONSPIRACY
### (By Plaintiffs Against All Defendants)

**139.** Plaintiffs reallege and incorporate in this Second Claim for Relief each and every allegation set forth above, as though fully set forth herein.

**140.** 18 U.S.C. § 1962(a) provides in relevant part: "It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or ..........to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

**141.** 18 U.S.C. § 1962(d) provides in relevant part:
It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

**142.** Through the acquisition of the income derived from its open-ended pattern of racketeering activity, Defendants not only invest in an ever-expanding drug

companies which also funds Defendants' criminal enterprise with kickbacks in the form of campaign contributions and other known and unknown perks. Defendants also use the funds for government lobbying purposes to influence local and state legislation which has a direct effect on both interstate and foreign commerce in direct violation of 18 U.S.C. § 1962(a) and Section 1961.

**143.** At all relevant times herein, Defendants and the Conspirators were each a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1962(d).

**144.** At all relevant times herein, Defendants and the Co-conspirators formed an association-in-fact for the specific purpose of obstructing justice and extorting the constitutional rights of Plaintiffs and others similarly situated. This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

**145.** At all times relevant herein, this enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1962(c).

**146.** As set forth in Plaintiffs' First Claim For Relief, Defendants and each of the Co-conspirators associated with this enterprise conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(5), in violation of RICO, 18 U.S.C. § 1962(c ).

**147.** At all relevant times herein, Defendants and the other Co-conspirators each were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962( c), that is, agreed to conduct and participate, directly or indirectly, in the

conduct of the affairs of the enterprise through a pattern of activity, in violation of 18 U.S.C. § 1962(d).

**148.**   Defendants and other Co-conspirators committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above. "A defendant can be guilty of [violation of Section 1962(d) for] conspiring to violate a law [Section 1962(c)], even if he is not among the class of persons who could commit the crime directly.") (emphasis added) abrogated on other grounds by Salinas v. United States, 522 U.S. 52 (1997). A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 253-254 (1940). The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other. See Pinkerton v. United States, 328 U.S. 640, 646 (1946) ("And so long as the partnership in crime continues, the partners act for each other in carrying it forward"). If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators. As Justice Holmes observed: "[P]lainly a person may conspire for the commission of a crime by a third person." United States v. Holte, 236 U.S. 140, 144 (1915).

**149.**   As a result of Defendants and the other Co-conspirators' violations of 18 U.S.C. § 1962(d), the Plaintiffs have lost hundreds of dollars in: petitioning the Defendants to not violate their rights, travel to and from the state capitol in Sacramento for the same purpose, which was to halt the criminal schemes Defendants created, organized, promoted, enacted and continue to operate and run.

**150.** As a result of the Conspiracy, Defendants are liable to the Plaintiffs for their losses in an amount to be determined at trial.

**151.** Pursuant to RICO, 18 U.S.C. § 1964(c), the Plaintiffs are entitled to recover threefold their damages plus costs from Defendants.

**152.** Plaintiffs have been injured in their business and property in accordance with U.S.C. § 1962(a)(c)(d) as a direct and proximate result of the racketeering activities of Defendants, and each of them, in that the Defendants' criminal legislative acts were directed at Plaintiffs, Plaintiffs' offspring, and others similarly situated.

**153.** Defendants' criminal enterprise have caused Plaintiffs to conduct legal research and incur court filing fees in federal court, and have caused Plaintiffs emotional distress, fear, anxiety and lack of sleep in having to defend themselves from Defendants' unlawful criminal activities.

**154.** The exact amount of Plaintiffs' economic damages incurred as a direct and proximate result of Defendants' conduct is unknown at this time. Plaintiffs will seek leave of Court to amend this Complaint to set forth the exact amount thereof when the same is ascertained.

**155.** As a direct and proximate result of the acquisition, maintenance, interest, control and income derived from the racketeering activities of the Defendants, and each of them, as described herein, Plaintiffs have suffered injuries to Plaintiffs' persons and property, and are entitled to recover treble damages for the injuries they have sustained, according to proof, as well as costs of suit and reasonable attorneys' fees, pursuant to 18 U.S.C. § 1964(c).

**156.** As a direct and proximate result of the racketeering activities of the Defendants, and each of them, as described herein, Plaintiffs are entitled to an Order, pursuant to 18 U.S.C. § 1964(a), enjoining and prohibiting the Defendants, and each of them, from further engaging in the same conduct as the enterprise has engaged in.

<u>**THIRD CLAIM FOR RELIEF FOR VIOLATION OF 18 U.S.C. § 175, CHAPTER 10- CONSPIRACY TO PROMOTE THE SALE AND USE OF BIOLOGICAL WEAPONS ON CALIFORNIA CITIZENS**</u>
**(By Plaintiffs Against All Defendant Legislators)**

**157.** Plaintiffs reallege and incorporate in this Third Claim for Relief each and every allegation set forth above, as though fully set forth herein.

**158. Sec. 175 - Prohibitions with respect to biological weapons.**

(a) In General.——Whoever knowingly develops, produces, stockpiles, transfers, acquires, retains, or possesses any biological agent, toxin, or delivery system for use as a weapon, or knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both. There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States.

(b) Additional Offense.——Whoever knowingly possesses any biological agent, toxin, or delivery system of a type or in a quantity that, under the circumstances, is not reasonably justified by a prophylactic, protective, bona fide research, or other peaceful purpose, shall be fined under this title, imprisoned not more than 10 years, or both. In this subsection, the terms "biological agent" and "toxin" do not encompass any biological agent or toxin that is in its naturally occurring environment, if the biological agent or toxin has not been cultivated, collected, or otherwise extracted from its natural source.

(c) Definition.——For purposes of this section, the term "for use as a weapon" includes the development, production, transfer, acquisition, retention, or possession

of any biological agent, toxin, or delivery system for other than prophylactic, protective, bona fide research, or other peaceful purposes.

**159.** The Defendants are well aware of the fact that all of the CDC scheduled vaccines are riddled with heavy metals (aluminum, formaldehyde, mercury, human DNA cells, etc.), neurotoxins and deadly Retroviruses according to Dr. Judy Mikovits, an ex-government scientist, PhD in Bio Chemistry and Molecular Biology. These chemical compounds administered as "vaccines" do not cure diseases but causes diseases including Autism, Chronic Fatigue Syndrome, HIV, Cancer and life threatening allergies.
**https://www.youtube.com/watch?v=KUtIO_h1fRA**

**160.** All the Defendant legislators have knowledge of these toxins and risks of exposure to the Plaintiffs and Plaintiffs' offspring. The vaccine ingredients qualify as biological weapons within the meaning of Section 175(c).  Section 175(a) provides: "Whoever knowingly assists a foreign state or any organization to do so, or attempts, threatens, or conspires to do the same, shall be fined under this title or imprisoned for life or any term of years, or both". Defendant legislators have conspired with and have been bribed by the pharmaceutical companies to be the promoters of these toxic poisons to force them upon the citizenry for their own profit and gain and more specifically as alleged in Plaintiffs' First and Second claims for relief in violation of Section 175 – Conspiracy to promote and force inject Plaintiffs' offspring with these biological weapons with the specific intent to injure, maim and or kill the subject individual. As alleged herein above, Defendants have conspired to violated Section 175 Ch. 10 of U.S.C. Title 18 and is therefore liable to Plaintiffs under 18 U.S.C. 1964(a) & (c).

## FOURTH CLAIM FOR RELIEF FOR VIOLATION OF 18 U.S.C. § 178, CHAPTER 11B- CONSPIRACY TO PROMOTE THE SALE AND USE OF CHEMICAL WEAPONS ON CALIFORNIA CITIZENS
### (By Plaintiffs Against All Defendant Legislators)

**161.**  Plaintiffs reallege and incorporate in this Fourth Claim for Relief each and every allegation set forth above, as though fully set forth herein.

**162.  Chapter 11B-Section 229, Chemical Weapons:**

(a) Unlawful Conduct.—Except as provided in subsection (b), it shall be unlawful for any person knowingly—
(1) to develop, produce, otherwise acquire, transfer directly or indirectly, receive, stockpile, retain, own, possess, or use, or threaten to use, any chemical weapon; or
(2) to assist or induce, in any way, any person to violate paragraph (1), or to attempt or conspire to violate paragraph (1).

**163.**  All the Defendant legislators have adequate knowledge of these toxins and risks of exposure to the Plaintiffs and Plaintiffs' offspring. The vaccine ingredients qualify as chemical weapons within the meaning of Section 229 of Chapter 11B.

**164.**  Defendant legislators have assisted the drug companies in a conspiracy to promote and assist their agents and affiliates (the Superintendent of Schools, Child Protective Services, Local Law Enforcement Agencies, and Health Care Practitioners) in forcing these chemical weapons on Plaintiffs, Plaintiffs' offspring and others similarly situated in violation of Section 229 of Chapter 11B, and as further alleged in Plaintiffs' claims for relief in the First, Second and Third claims for relief. Defendant legislators and their Co-Conspirators qualify as domestic terrorists within the meaning of sections 229 and 175 of this title, and as such, their criminal conduct comes within the purview of the "RICO" laws. And as further alleged in the preceding paragraphs above, Defendants have violated Section 229

of Ch. 11B of Title 18 of the U.S. Code and is therefore liable to Plaintiffs under 18 U.S.C. 1964(a) & (c).

**165.**  Pursuant to the original Statutes at Large, the "RICO" laws itemized above are to be liberally construed by this honorable Court to effectuate its remedial purpose.

## FIFTH CLAIM FOR RELIEF FOR VIOLATION OF 18 U.S.C. § 241
### (By Plaintiffs Against All Defendant Legislators)

**166.**  Plaintiffs reallege and incorporate in this Fifth Claim for Relief each and every allegation set forth above, as though fully set forth herein.

**167.  Title 18 U.S.C. § 241 provides in pertinent parts:**

If two or more citizens conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

If two or more citizens go in disguise on the highway, or on the premises of another with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured-

They shall be fined not more than $10,000 or imprisoned not more than ten years, or both;

**168.**  Defendant legislators and their Co-Conspirators through a pattern of racketeering activity, and as alleged in the paragraphs 98 through 174 above and as alleged in the 1st, 2nd, 3rd, and 4th claims for relief, in passing SB277 are in violation of 18 U.S.C. § 241 and are thereby liable to Plaintiffs under 18 U.S.C. § 1964(a) & (c).

## SIXTH CLAIM FOR RELIEF FOR VIOLATION OF 18 U.S.C. § 242
### (By Plaintiffs Against All Defendant Legislators)

**169.**   Plaintiffs reallege and incorporate in this Sixth Claim for Relief each and every allegation set forth above, as though fully set forth herein.

**170**.   **Title 18 U.S.C. § 242 provides in pertinent parts:**
Any Citizen, who under color of law, statute, ordinance, regulation, or custom, willfully subjects any inhabitant of any State Territory, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains or penalties, on account of such inhabitant being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined not more than $1,000 or imprisoned not more than one year or both;

**171.**   Defendant legislators and their Co-Conspirators through a pattern of racketeering activity, and as alleged in the paragraphs 98 through 177 above and as alleged in the 1st, 2nd, 3rd, 4th & 5th claims for relief, in passing SB277 are in violation of 18 U.S.C. § 242 and are thereby liable to Plaintiffs under 18 U.S.C. § 1964(a) & (c).

## SEVENTH CLAIM FOR RELIEF FOR VIOLATION OF 42 U.S.C. § 1983
### (By Plaintiffs Against All Defendant Legislators)

**CONSTITUTIONAL AND STATUTORY PROVISIONS INVOKED UNDER THE COMMON LAW AND UCC 1-103.6**

**-Judicial Notice Requested-**
**The Law, The Court And All Proceedings Must Be in Accordance With The U.S. Constitution And The Common Law.**

1. The assertion of federal rights, when plainly and reasonably made, is not to be defeated under the name of local practice. (Davis v. Wechsler, 263 US 22, 24).

2. The constitution is to be interpreted according to common law rules. Schick v. U.S., 195 US 65, 24 Sup. Ct. 826, 49 L. Ed. 99.

3. Cohens v Virginia, 6 wheat (19 U.S.) 264, 404 (1821): Chief Justice John Marshall said "We [public servants] have no more right to decline the jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the constitution."

4. Ramsey v. Allegrie, 25 U.S. (12 Wheaton) 611, 631 (1827): "If the common law can try the cause and give full redress, that alone takes away the admiralty jurisdiction."

5. Hayburn's Case. 2 Dali. (2 U.S.) 409 (1792); Article #6 Clauses 2 and 3, U.S. Constitution: "This Constitution is the supreme Law of the Land. All judicial officers of the united States are bound by oath or affirmation, to support this Constitution.

6. Boyd v. U.S., 116 U.S. 635 (1886):"Constitutional provisions for the security of person and property should be liberally construed. It is the duty of the courts to be watchful of constitutional rights against any stealthy encroachments thereon."

7. Norton v. Shelby County 118 USR 425 (1886):"An unconstitutional act is not law. It confers no rights, it imposes no duties, it affords no protections, it creates no office. It is in legal contemplation as inoperative as though it has never been passed."

8. Miranda v. Arizona 384 US 436 (1966): "Where rights secured by the constitution are involved, there can be no rule or law making or legislation which would abrogate or abolish them."

9. "A legislative act contrary to the Constitution is not law." Carter v. Carter Coal Co., 298 U.S. 238.

10. "All laws which are repugnant to the Constitution are null and void." Marbury v. Madison, 5 U.S. 137,174,176.

11. "The claim and exercise of a Constitutional Right cannot be converted into a crime." Miller v. US., 230 F, 2d 286,489.

12. "The mere chilling of a Constitutional right by a penalty on its exercise is patently unconstitutional." Shapiro v. Thompson, 394 U.S. 618. A law that "impinges upon a fundamental right explicitly or implicitly secured by the Constitution is presumptively unconstitutional." Mobile v. Bolden, 446 US 55, 76; Harris v. McRae, 448 US 297,312.

13. A law that improperly infringes on Constitutional Rights is void from its inception and no person can be obligated to obey such a law. 16A ArnJur2d Constitutional Law, Section 203.

14. SB277 as amended and applied is wholly unconstitutional for the above stated lawful case law precedents.

15. Plaintiffs assert that SB277 and any statutory laws or state codes related thereto are not applicable, and Plaintiffs are exempt from jurisdiction of said codes except and unless said codes or statutory laws can be proven to be in harmony with the U.S. Constitution and the common law (UCC 1-103.6).

**172.** Plaintiffs reallege and incorporate in this Seventh Claim for Relief each and every allegation set forth above, as though fully set forth herein.

**173.** At all times material herein, there was in full force and effect certain provisions of the Constitution of the United States, namely, U.S. Constitution Amendment 14, § 1 that states in pertinent part as follows:

... nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**174.** At all times material herein, there was in full force and effect certain provisions of the Constitution of the United States, namely, U.S. Constitution Amendment 4, that states in pertinent part as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

**175.** At all times material herein, there was in full force and effect certain provisions of the Constitution of the United States, namely, U.S. Constitution Amendment 5, that states in pertinent part as follows:

... nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

**176.** At all times material herein, there was in full force and effect certain provisions of the Constitution of the United States, namely, U.S. Constitution Amendment 1, that states in pertinent part as follows:
Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances.

**177.**    At all times material herein, there was also in full force and effect a certain statute of the United States known as the Civil Rights Act of 1871, 42 U.S.C.A. § 1983, which provides, in pertinent part as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

**178.**    At all times material herein, there was also in full force and effect a certain statute of the United States known as the Civil Rights Act of 1871, 42 U.S.C.A. § 1986, which provides, in pertinent part as follows:

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action; and if the death of any party be caused by any such wrongful act and neglect, the legal representatives of the deceased shall have such action therefor, and may recover not exceeding $5,000 damages therein, for the benefit of the widow of the deceased, if there be one, and if there be no widow, then for the

benefit of the next of kin of the deceased. But no action under the provisions of this section shall be sustained which is not commenced within one year after the cause of action has accrued.

**179.** In order to establish personal liability part of government official in federal civil rights law action, under Title 42 U.S.C. §1983, it is enough to show that official acting under color of law caused deprivation of Constitutional Right in contrast. Government entity is liable in official capacity suit under Title 42 U.S.C. only when entity is moving force behind deprivation. Thus requiring entity policy or custom to have played a part in violation of Federal law. Ref. Kentucky V. Graham 1985 475, US 159 85 L.Ed. 2d. 114, 105 S. Ct. 3099.

**180.** Defendant legislators have long established a policy, custom and usage of violating their oaths of office to pass unconstitutional laws directed at stripping the constitutional rights of Plaintiffs and others similarly situated.

### Count 1

**181.** The First Amendment to the U.S. Constitution secures Plaintiffs the right to religious or personal freedoms. In passing SB277 Plaintiffs' offspring would be barred from entering public schools unless and until they have complied with ALL the required CDC scheduled vaccinations. Plaintiffs and their offspring would be required to waive their rights under their deeply held spiritual beliefs and training to comply with SB277. Defendant legislators violated Plaintiffs' protected rights under the First Amendment to the U.S. Constitution and is therefore liable to Plaintiffs under 42 U.S.C. § 1983 and the common law.

### Count 2

**182.** Article 1 Section 4 of the California constitution guarantees Plaintiffs' the free exercise and enjoyment of religious freedom without discrimination or

preference. SB277 would preclude Plaintiffs and their offspring from invoking their rights of religious freedoms under California law to be in compliance with its mandate.  In passing SB277 Defendant legislators have discriminated against Plaintiffs and their offspring with respect to Plaintiffs' protected rights under the First Amendment to the U.S. Constitution and Art. 1 Sec. 4 of the California constitution and is therefore liable to Plaintiffs under 42 U.S.C. § 1983 and the common law.

### Count 3

**183.**   The Fourth Amendment to the U.S. constitution provides for the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

**184.**   SB277 would preclude Plaintiffs and their offspring from invoking their rights of privacy with respect to the disclosure of their medical information to school officials. In turn the school officials would use this information for the sole purpose of reporting this information to the local law enforcement agencies and or Child Protective Services for initiating criminal prosecutions against Plaintiffs and other parents of partially or unvaccinated offspring. Plaintiffs and their offspring would be required to waive their rights of privacy and the right to be let alone under the Fourth Amendment in order to comply with SB277. Defendant legislators in enacting SB277 have violated Plaintiffs' protected rights under the Fourth Amendment to the U.S. Constitution and is therefore liable to Plaintiffs under 42 U.S.C. § 1983 and the common law.

### Count 4

**185.**   SB277 violates Plaintiffs and their offspring's rights under the Fifth Amendment to the U.S. constitution in that the unwanted injections of poisons into

their offspring is considered a felony assault with intent to do serious harm, including but not limited to maiming and or killing the individual. Under the Fifth Amendment, Plaintiffs and their offspring have the right not to be maimed, injured in their health or killed without due process of law.

**186**.   The right of self-defense and self-preservation is natural right long precedent to the U. S. Constitution.

Self-defense as stated by Justice Blackstone of "Blackstone's Commentaries On English Common Law":

"The defense of one's self, or the mutual and reciprocal defense of such as stand in the relations of husband and wife, parent and child, master and servant. In these cases, if the party himself or any of these his relations, be forcibly attacked in his person or property, it is lawful for him to repel force by force; and the breach of the peace, which happens, is chargeable upon him only who began the affray. For the law, in this case, respects the passions of the human mind; and (when external violence is offered to a man himself, or those to whom he bears a near connection) makes it lawful in him to do himself that immediate justice, to which he is prompted by nature, and which no prudential motives are strong enough to restrain. It considers that the future process of law is by no means an adequate remedy for injuries accompanied with force; since it is impossible to say to what wanton lengths of rapine or cruelty outrages of this sort might be carried, unless it were permitted a man immediately to oppose one violence with another. Self-defense, therefore, as it is justly called the primary law of nature, so it is not, neither can it be in fact, taken away by the law of society. In the English law particularly it is held an excuse for breaches of the peace, nay even for homicide itself."
*-Blackstone's Commentaries Book 2 pages 1491 & 1493*.

**187.** Defendant legislators in enacting SB277 have violated Plaintiffs' protected rights under the Fifth Amendment to the U.S. Constitution and is therefore liable to Plaintiffs under 42 U.S.C. § 1983 and the common law.

**Count 5**

**188.** In passing SB277 Plaintiffs' offspring would be barred from entering public schools unless and until they have complied with ALL the required CDC scheduled vaccinations. In short, SB277 discriminates against Plaintiffs' offspring due to the status of their vaccination schedules not their state of health at the time of entering school. This is a direct violation of the Fourteenth Amendment to the U.S. constitution is therefore actionable under 42 U.S.C. § 1983, and Defendant legislators therefore liable to Plaintiffs under 42 U.S.C. § 1983 and the common law.

**EIGHTH CLAIM FOR RELIEF FOR VIOLATION OF 42 U.S.C. § 1986**
**(By Plaintiffs Against All Defendant Legislators)**

**189.** Plaintiffs reallege and incorporate in this Eighth Claim for Relief each and every allegation set forth above, as though fully set forth herein

**190.** 42 U.S.C.A. § 1986, which provides, in pertinent part as follows:

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action;

## Count 6

**191.** Each and every Defendant legislator along with Defendant Edmund Brown on behalf of the Defendant State of California agreed to join the conspiracy and acted in concert with one another in violating the civil and constitutional rights of the Plaintiffs and their offspring, particularly as plead in paragraphs 98 through 199 herein above. Defendant legislators had knowledge that the wrongs were about to occur, and having power to prevent them, neglected or refused to intervene to prevent the violations from occurring in violation of 42 U.S.C. §1986. Defendant legislators are therefore liable to Plaintiffs under 42 U.S.C. § 1983, 1986 and the common law.

## Count 7
### Violation of The Thirteenth Amendment To The U.S. Constitution by Defendant Legislators

**192.** The Thirteenth Amendment provides;

"Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." Formally abolishing slavery in the United States, the 13th Amendment was passed by the Congress on January 31, 1865, and ratified by the states on December 6, 1865.

**193.** The mandatory requirement that Plaintiffs and their offspring comply with an unlawful tyrannical law puts Plaintiffs and others similarly situated in a perpetual state of civil enslavement at the whims of Defendant State of California and its agencies in violation of the 13th Amendment to the U.S. constitution. The passage of SB277 violates Plaintiffs' and their offspring's rights constitutionally, and thus Defendants are liable to Plaintiffs under 42 U.S.C. § 1983.

## NINTH CLAIM FOR RELIEF FOR INTENTIONAL INFLICTION OF EMOTIOANAL DISTRESS
### (By Plaintiffs Against All Defendants)

**194.** Plaintiffs reallege and incorporate in this Eighth Claim for Relief each and every allegation set forth above, as though fully set forth herein.

**195.** As an actual and proximate cause of Defendants actions, Plaintiffs have suffered severe emotional distress, including but not limited to lack of sleep, anxiety, irritability, anger and sorrow. As a result of Defendants' wrongful acts and/or omissions, Plaintiffs are entitled to various remedies including, but not limited to, reimbursement, equitable recoupment, indemnification, damages (statutory, actual, punitive and/or treble damages), attorney's fees and cost and injunctive relief for the undue emotional distress caused by the Defendants.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against the Defendants, and each of them, as follows:

### ON THE FIRST CLAIM FOR RELIEF

1. For treble the amount of actual damages in an amount to be determined according to proof at trial;
2. For reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c);
3. For an Order enjoining and prohibiting Defendants, and each of them, from further engaging in the racketeering conduct as described in this Complaint;

### ON THE SECOND CLAIM FOR RELIEF

4. For treble the amount of actual damages in an amount to be determined according to proof at trial;

5. For reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c);

6. For an Order enjoining and prohibiting Defendants, and each of them, from further engaging in the racketeering conduct as described in this Complaint;

## ON THE THIRD CLAIM FOR RELIEF

7. For treble the amount of actual damages in an amount to be determined according to proof at trial;

8. For reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c);

9. For an Order enjoining and prohibiting Defendants, and each of them, from further engaging in the racketeering conduct as described in this Complaint;

## ON THE FOURTH CLAIM FOR RELIEF

10. For treble the amount of actual damages in an amount to be determined according to proof at trial;

11. For reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c);

12. For an Order enjoining and prohibiting Defendants, and each of them, from further engaging in the racketeering conduct as described in this Complaint;

## ON ALL CLAIMS FOR RELIEF

13. For restitution to all Plaintiffs in an amount $25,000 against each Defendant on each claim for relief and each count;

14. For a temporary, preliminary and permanent injunction, pursuant to 28 U.S.C. Section 2201, enjoining and restraining Defendant legislators and the Defendant State of California, its employees, servants, agents, affiliates, distributors, dealers, members, attorneys, successors and/or assigns, and all persons in active concert or participation with any of them, in enforcing SB277 on Plaintiffs, Plaintiffs' offspring;

15. For a declaratory Order that SB277 is void for want of lawful enactment due

to its repugnance to the First, Fourth, Fifth, Ninth, and Fourteenth Amendments to the united States Constitution;

16. For a declaratory Order that all named Defendants be required to take **all** of the CDC's 70 scheduled inoculations; to be completed within a 48 hour time-period, and that such shots be administered by Dr. Brian Hooker and Dr. Jim Sears.

17. For reasonable attorneys' fees to the full extent permitted under "RICO".

18. That all issues so triable be tried to a 7th Amendment jury at common law;

19. For costs of suit incurred herein; and

20. For such other and further relief as this Court deems just and proper.

Dated: August 2, 2016

Respectfully Submitted,

Travis Middleton
27 West Anapamu # 153
Santa Barbara, California 93101

**VERIFICATION**

We, Travis Middleton, Eric Durak, Jade Baxter, Julianna Pearce, Candace Estave, Denise Michele Derusha, Melissa Christou, Andrea Lewis, Rachil Vincent, Jackie Kozak, Don Demanlevesde, Jessica Haas, Paige Murphy, Christie Macias, Lori Strantz, Anwanur Gielow, Lisa Ostendorf, Julia Anne Whitney, Pam Corner, Jodie Tisserand, Andy Taff, Alice Tropper, Bret Nielsen, Brent Haas, Muriel Rosensweet, and Marina Read are Plaintiffs and Parties Injured in the above-titled action. We have read the foregoing Complaint and know the contents thereof. The same is true of our own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, we believe them to be true.

I/we declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed at Santa Barbara, California.

Dated this 2nd day of August, 2016

Eric Durak

Jade Baxter

Julianna Pearce

1

Candyce Estave

2

3

Denise Michele Derusha

4

5

Melissa Christou

6

7

Andrea Lewis

8

9

Rachil Vincent

10

11

12

Jackie Kozak

13

14

Don Demanlevesde

15

16

Jessica Haas

17

18

Paige Murphy

19

20

21

Christie Macias

22

23

Lori Strantz

24

25

Anwanur Gielow

26

27

Lisa Ostendorf

28

R.I.C.O. Complaint, 7th Amendment Jury Trial Demanded- 69

1

2          JuliaAnne Whitney

3

4          Pam Corner

5

6          Jodie Tisserand

7

8          Andy Taff

9

10         Alice Tropper

11

12         Bret Nielsen

13

14         Brent Haas

15         Muriel Rosensweet

16

17         Marina Read

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A



## OFFICE OF THE GOVERNOR

June 30, 2015

To the Members of the California State Senate:

SB 277 has occasioned widespread interest and controversy – with both proponents and opponents expressing their positions with eloquence and sincerity. After carefully reviewing the materials and arguments that have been presented, I have decided to sign this bill.

The science is clear that vaccines dramatically protect children against a number of infectious and dangerous diseases. While it's true that no medical intervention is without risk, the evidence shows that immunization powerfully benefits and protects the community.

The Legislature, after considerable debate, specifically amended SB 277, to exempt a child from immunizations whenever the child's physician concludes that there are "circumstances, including but not limited to, family medical history, for which the physician does not recommend immunization…"

Thus, SB 277, while requiring that school children be vaccinated, explicitly provides an exception when a physician believes that circumstances – in the judgement and sound discretion of the physician – so warrant.

Sincerely,

Edmund G. Brown Jr.

GOVERNOR EDMUND G. BROWN JR. • SACRAMENTO, CALIFORNIA 95814 • (916) 445-2841

Travis Wild Wes
#6 27 West Anapamu #153
Santa Barbara, California Republic [9310]

CERTIFIED MAIL

7015 0640 0000 0910 4610

Marie Pogosyan, Court Clerk
United States District Court,
Central District of California, Western
3/2 North Spring Street Rm G-8
Los Angeles, CA 90012

RECEIVED
CLERK U.S. DISTRICT COURT

AUG 10 2016

CENTRAL DISTRICT OF CALIFORNIA



U.S. POSTAGE
SANTA BARI
93101
AUG 08 16
AMOUNT
$13
R2305H1289
1022
90012