

FILED
CLERK, U.S. DISTRICT COURT

JULY 13, 2017

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

RECEIVED BUT NOT FILED
CLERK, U.S. DISTRICT COURT

JAN - 9 2017

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

Travis Middleton
27 West Anapamu Street No. 153
Santa Barbara, California 93101
Travis_m_93101@yahoo.com
(805) 284-6562
Pro Se

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| Travis Middleton, Eric Durak, Jade Baxter, Julianna Pearce, Candyce Estave, Denise Michele Derusha, Melissa Christou, Andrea Lewis, Rachil Vincent, Don Demanlevesde, Jessica Haas, Paige Murphy, Lori Strantz, Anwanur Gielow, Lisa Ostendorf, JuliaAnne Whitney,   Alice Tropper, Bret Nielsen, Brent Haas, Muriel Rosensweet, Marina Read,<br><br>Plaintiffs,<br><br>vs.<br><br>Richard Pan, Win-Li Wang, Martin Jeffrey "Marty" Block,  Gerald A. "Jerry" Hill, Holly Mitchell, Catharine Baker, Christina Garcia, Adrin Nazarian, Jim Wood, Ben Allen, Kevin de Leon, Hannah-Beth Jackson, Jeff Stone, Richard Bloom, Bill Quirk, Lorena Gonzalez, Reginald Jones-Sawyer, Isadore Hall, Mark Leno, Bob Wieckowski, David Chiu, Evan Low, Anthony Rendon, Jim Beall, Robert Hertzberg, Mike McGuire, Lois Wolk, | Incorporated Case No.:<br>LA CV16-05224-SVW-AGR<br>VERIFIED SECOND AMENDED COMPLAINT FOR:<br><br>**1.** VIOLATION OF THE RACKETEERING INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") 18 U.S.C. §§ 1961, 1962(a)(b)(c), 1964 (a)(c);<br><br>a). 1503-Obstruction of Justice<br>b). 1952-Racketeering<br>c). 1951- Extortion of Liberty Under Color of Official Right<br><br>**2.** Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971); 42 U.S.C. §§ 1983 & 1986<br><br>**3.** COMMON LAW JURISDICTION UCC 1-103.6<br><br>DEMAND FOR JURY TRIAL<br>REQUEST LEAVE TO AMEND |

Bruce Wolk, Jim Cooper, Mark Stone,    )
Edmund G. Brown Jr., Anne Gust,        )
Alicia G. Rosenberg, Jonathan E. Rich, )
Jacqueline Y. Young, Cara L. Jenkins,  )
The State of California and DOES 1      )
through 10,                             )
                                       )
         Defendants.                        )
*(Defendant Legislators are sued in their* )
*"Personal-Private" & official*         )
*capacities*)                           )

# **COMPLAINT**

COMES NOW Plaintiffs, bringing this Incorporated Case, under the American Flag of peace, and states:

Ex rel.: for the people of the united states; "…But it is the manner of enforcement which gives Title 42 U.S.C. 1983 its unique importance, for the enforcement is placed in the hands of the people." Each citizen "acts as a private attorney general who takes on the mantle of the sovereign, guarding for all of us the individual liberties enunciated in the constitution." Section 1983 represents a balancing feature in our government structure whereby individual citizens are encouraged to police those who are charged with policing us all. Thus, it is of special importance that suits brought under this statute be resolved by a determination of truth." Wood v. Breir, 54 F.R.D. 7, (1972).

Both statutes [RICO and Clayton Act] bring to bear the pressure of "private attorneys general" on a serious national problem for which public prosecutorial resources are deemed inadequate; the mechanism chosen to reach the objective in both the Clayton Act and RICO is the carrot of treble damages. [Agency Holding Corp. v. Malley-Duff & Associates][107 S.Ct. 2759, 483 U.S. 143, 151

(1987)][bold emphasis added]. In rejecting a significantly different focus under RICO, therefore, we are honoring an analogy that Congress itself accepted and relied upon, and one that promotes the objectives of civil RICO as readily as it furthers the objects of the Clayton Act. Both statutes share a common congressional objective of encouraging civil litigation to supplement Government efforts to deter and penalize the respectively prohibited practices.

The object of civil RICO is thus not merely to compensate victims but to turn them into prosecutors, "private attorneys general," dedicated to eliminating racketeering activity. [3] *Id.*, at 187 (citing *Malley-Duff*, 483 U.S., at 151). (Civil RICO specifically has a "further purpose [of] encouraging potential private plaintiffs diligently to investigate"). The provision for treble damages is accordingly justified by the expected benefit of suppressing racketeering activity, an object pursued the sooner the better. [Rotella v. Wood *et al.*, 528 U.S. 549 (2000)] [bold and underline emphases added]. This Incorporated Case affirms evidence of multiple constitutional and civil right violations pursuant to 42 USC 1983, which has inflicted irreparable harm on Citizens of the State of California, all of the above named Plaintiffs, Parties Injured. This Incorporated Case may identify acts prohibited under 18 U.S.C. 1961 through 18 U.S.C. 1964. Definition: "Case Incorporated", the formation of a legal body, with the quality of perpetual existence and succession. (2). Consisting of an association of numerous individuals. (3). Matters relating to the common purpose of the association, within the scope of the powers and authorities conferred upon such bodies with the quality of perpetual existence and successions. Ref. Black's Law Dictionary 67th Pg. 690. "Case Incorporation" will establish the legal bounds of the members of this lawful assembly to solve a specific "Case Number" and the issues in motion.

Additionally, all of the above named Plaintiffs in the above-captioned matter submit their Second Amended Complaint, which incorporates the First

Amendment Complaint, all exhibits and attachments from plaintiffs' Criminal

Affidavits on file herein as follows:

## STATEMENT OF THE CASE

### -SB277 IS NOT ABOUT PUBLIC HEALTH. IT'S ABOUT MANDATING POISONS TO CHILDREN AND THE GENERAL PUBLIC-

In 1932 the U.S. Public Health Service began a study of the natural progression of untreated syphilis in rural African-American men in Alabama under the auspices of receiving free health care from the United States government. It was called the "Tuskegee Study of Untreated Syphilis in the Negro Male." The study initially involved 600 black men – 399 with syphilis, 201 who did not have the disease. The study was conducted without the benefit of patients' informed consent. Researchers told the men they were being treated for "bad blood," a local term used to describe several ailments, including syphilis, anemia, and fatigue. In truth, they did not receive the proper treatment needed to cure their illness. In exchange for taking part in the study, the men received free medical exams, free meals, and burial insurance. Although originally projected to last 6 months, the study actually went on for 40 years and ended officially in 1972.  Their doctors had no intention of curing them of syphilis at all. The data for the experiment was to be collected from autopsies of the men, and they were thus deliberately left to degenerate under the ravages of tertiary syphilis—which can include tumors, heart disease, paralysis, blindness, insanity, and death. "As I see it," one of the doctors involved explained, "we have no further interest in these patients until they die." In the summer of 1973, an attorney named Fred Gray filed a class-action lawsuit on behalf of the study participants and their families. In 1974, a $10 million out-of-court settlement was reached. As part of the settlement, the U.S. government promised to give lifetime medical benefits

and burial services to all living participants. The Tuskegee Health Benefit
Program (THBP) was established to provide these services. In 1975, wives,
widows and offspring were added to the program. In 1995, the program was
expanded to include health as well as medical benefits. The Centers for Disease
Control and Prevention was given responsibility for the program, where it
remains today in the National Center for HIV/AIDS, Viral Hepatitis, STD, and
TB Prevention. The last study participant died in January 2004. The last widow
receiving THBP benefits died in January 2009.  On June 13 of 2015 the State of
California implemented a new version of The Tuskegee Experiment. It is now
known as bill *SB277*. The California Vaccine Mandate. See attached as ***Exhibit
A***. All of the named Defendants knew before hand of the toxic list of ingredients
that are in these inoculations including but not limited to:

aluminum hydroxide, aluminum phosphate, ammonium sulfate, amphotericin B,
animal tissues: (pig blood, horse blood, rabbit brain), dog kidney, monkey
kidney, chick embryo, chicken egg, duck egg, calf (bovine) serum,
betapropiolactone, fetal bovine serum, formaldehyde (embalming fluid),
formalin, gelatin, glycerol, human diploid cells (originating from human aborted
fetal tissue), hydrolized gelatin, mercury thimerosol (thimerosal, Merthiolate(r)),
monosodium glutamate (MSG), neomycin, neomycin sulfate, phenol red
indicator, phenoxyethanol (antifreeze). See vaccine excipient list attached as
***Exhibit B.***

Data on phenoxyethanol (antifreeze) can be seen here at the National Center for
Biotechnology Information. PubChem Compound Database; *CID=31236,*
*https://pubchem.ncbi.nlm.nih.gov/compound/31236 (accessed Apr. 7, 2016)*. See
also attached MSDS under ***Exhibit C.***


ALTERNATIVE and IN VITRO TESTS/ in vaccines/biologics, preservatives are
used to prevent microbial growth. The present study examined: (1) the

comparative toxicities of commonly used preservatives in US licensed vaccines to human neurons; and (2) the relative toxicity index of these compounds to human neurons in comparison to bacterial cells. Using human neuroblastoma cells, the relative cytotoxicity of the levels of the compounds commonly used as preservative in US licensed vaccines was found to be phenol <2-phenoxyethanol < benzethonium chloride < Thimerosal. The observed relative toxicity indices (human neuroblastoma cells/bacterial cells) were 2-phenoxyethanol (4.6-fold) < phenol (12.2-fold) < Thimerosal (>330-fold). In addition, for the compounds tested, except for 2-phenoxyethanol, the concentrations necessary to induce significant killing of bacterial cells were significantly higher than those routinely present in US licensed vaccine/biological preparations.

None of the compounds commonly used as preservatives in US licensed vaccine/biological preparations can be considered an ideal preservative, and their ability to fully comply with the requirements of the US Code of Federal Regulations (CFR) for preservatives is in doubt. Future formulations of US licensed vaccines/biologics should be produced in aseptic manufacturing plants as single dose preparations, eliminating the need for preservatives and an unnecessary risk to patients. Abstract: PubMed.
It is also listed as a hazardous substance under: U.S. Clean Air Act (CAA), U.S. Department of Transportation (DOT) and the U.S. National Toxicology Program (NTP) 11th Report Part A "Known to be Human Carcinogens".
**Aluminum hydroxide & aluminum phosphate:** See attached MSDS *Exhibit D.* Aluminum is put into vaccines as an adjuvant purportedly to help them "work better" or to "enhance" them. It begs the question, to help them do what better exactly? Maim and kill people? Aluminum is present in food, air, water, and soil and is said to be harmless when swallowed because the body doesn't absorb it well. But aluminum put directly into the blood stream is another matter. - See

more at: http://www.westonaprice.org/health-topics/vaccination/adjuvants-in-vaccines/#sthash.nXgSL1wj.dpuf.

According to the FDA, Aluminum may reach toxic levels with prolonged parenteral feeding . . . Research indicates that patients with impaired kidney function, including premature neonates [babies], who received parenteral levels of aluminum at greater than 4 to 5 micrograms per kilogram of body weight per day, accumulate aluminum at levels associated with central nervous system and bone toxicity. Tissue loading may occur at even lower rates of administration." Also, according to government documents, "Aluminum content in parenteral drug products could result in a toxic accumulation of aluminum in individuals receiving TPN therapy. Research indicates that neonates and patient populations with impaired kidney function may be at high risk of exposure to unsafe amounts of aluminum. Studies show that aluminum may accumulate in the bone, urine, and plasma of infants receiving TPN. Many drug products used in parenteral therapy may contain levels of aluminum sufficiently high to cause clinical manifestations . . . parenteral aluminum bypasses the protective mechanism of the GI tract and aluminum circulates and is deposited in human tissues. Aluminum toxicity is difficult to identify in infants because few reliable techniques are available to evaluate bone metabolism in . . . infants . . . Although aluminum toxicity is not commonly detected clinically, it can be serious in selected patient populations, such as neonates, and may be more common than is recognized. From these documents we learn that if a premature baby receives more than 10 mcg per day of aluminum in an IV, it can accumulate in their bones and brain, and can be toxic.

The FDA's maximum requirements for aluminum received in an IV is 25 mcg per day. The suggested aluminum per kilogram of weight to give to a person is up to 5 mcg. Thus, a baby weighing five pounds should get no more than 11 mcg of aluminum.

Anything that has more than 25 mcg of aluminum per dose requires a label that says: "WARNING: This product contains aluminum that may be toxic. Aluminum may reach toxic levels with prolonged parenteral administration if kidney function is impaired. Premature neonates are particularly at risk because their kidneys are immature, and they require large amounts of calcium and phosphate solutions, which contain aluminum."

There is no requirement for vaccines to carry this label and also no requirement to limit the maximum dosage to 25 mcg. All vaccines exceed the maximum allowable aluminum per day for babies, toddlers and children. At birth, most children are given the hepatitis B vaccination. The amount of aluminum in the hepatitis B vaccine alone is almost fourteen times the amount of aluminum that is FDA-approved for an eight-pound baby.

At well-baby check-ups, it's common for two-month, four-month, and six-month appointments to include up to eight vaccinations, which add up to more than 1,000 mcg of aluminum. This amount isn't even safe for a 350-pound adult. And many children get up to eight vaccinations per visit several times a year. By eighteen months, fully vaccinated babies have received almost 5000 mcg (5 milligrams) of highly neurotoxic aluminum into the bloodstream.

The counter argument is that in parenteral feeding, all the aluminum goes instantaneously into the circulation, while in vaccines only a portion goes into the circulatory system. Still, it is reasonable to question the safety of aluminum doses that are many times higher than those considered safe for parenteral feeding.

According to the FDA and the AAP (American Academy of Pediatrics), at more than the maximum required dose, aluminum builds up in the bones and brain and can be toxic. Aluminum can cause neurological harm, including cognitive impairment in healthy adults. Aluminum overdose can be fatal in patients with weak kidneys or kidney disorders or in premature babies. Could this

1  be why the hepatitis B shot, given to infants at birth, has been linked to sudden
2  infant death syndrome (SIDS)?
3  **Formaldehyde (embalming fluid):** *See attached MSDS* ***Exhibit E.***
4  Formaldehyde is toxic and is known to cause cancer. The International Agency
5  for Research on Cancer (IARC) classifies formaldehyde as a human carcinogen.
6  In 2011, the National Toxicology Program, an interagency program of the
7  Department of Health and Human Services, named formaldehyde as a known
8  human carcinogen. In addition, 10-20 percent of the general population may be
9  susceptible to formaldehyde allergies and may react acutely at any exposure
10 level. Formaldehyde is oxidized to formic acid which leads to acidosis and nerve
11 damage. Acidosis can be described as a condition in which the acidity of the
12 body tissues and fluids is abnormally high. The liver and the kidneys may also be
13 damaged.
14 **OSHA has warnings of exposure to humans to formaldehyde.**
15 Ingestion: Ingestion of as little as 30 ml of a 37 percent solution of formaldehyde
16 (formalin) can result in death. Gastrointestinal toxicity after ingestion is most
17 severe in the stomach and results in symptoms which can include nausea,
18 vomiting, and severe abdominal pain. Diverse damage to other organ systems
19 including the liver, kidney, spleen, pancreas, brain, and central nervous systems
20 can occur from the acute response to ingestion of formaldehyde. Long term
21 exposure to formaldehyde has been shown to be associated with an increased risk
22 of cancer of the nose and accessory sinuses, nasopharyngeal and oropharyngeal
23 cancer, and lung cancer in humans. Animal experiments provide conclusive
24 evidence of a causal relationship between nasal cancer in rats and formaldehyde
25 exposure. Concordant evidence of carcinogenicity includes DNA binding,
26 genotoxicity in short-term tests, and cytotoxic changes in the cells of the target
27 organ suggesting both preneoplastic changes and a dose-rate effect.
28

Formaldehyde is a complete carcinogen and appears to exert an effect on at least two stages of the carcinogenic process.

The California Department of Public Health as stated that "Overexposure to Formaldehyde irritates the eyes, nose, throat, and skin. Formaldehyde can cause allergic reactions of the skin (dermatitis) and the lungs (asthma). Formaldehyde is a known cause of cancer in humans." Reference: https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=8&cad=rja&uact=8&ved=0ahUKEwjQpKyvrf3LAhVFsYMKHUV2DvsQFghPMAc&url=https%3A%2F%2Fwww.cdph.ca.gov%2Fprograms%2Fhesis%2FDocuments%2Fformaldehyde.pdf&usg=AFQjCNE7Gk0Ej_LzQolPfZg6CLnSALRVSg&sig2=ajmlghfcTjgQt9ZN3SXp0A.  See MSDS Data Sheet attached as Exhibit

**Mercury Thimerosol-** *see attached **Exhibit F**.*

Thimerosal is a preservative containing approximately 50 percent mercury. Mercury is the second most poisonous element known to man (next to uranium and its derivatives). When someone says, "Mercury!" we immediately think of the news stories about the child at school who broke a thermometer in biology class and the hazmat team was called in. All the students were in peril. Hazmat teams are called in for less mercury than the amount contained in one vaccine. Thimerosal prevents bacteria growth in multi-use vaccines. It was removed from many vaccines in 2004—at which time more vaccines containing aluminum were added to the schedule, while mercury-laden flu vaccines were then recommended for infants, and two years later for pregnant women, Mercury is also used in the vaccine creation process and then through a purification procedure it is purportedly "removed".  However, in some vaccines, "trace" amounts are still left.

- See more at: http://www.westonaprice.org/health-topics/vaccination/adjuvants-in-vaccines/#sthash.nXgSL1wj.dpuf

There are mounds of other data surrounding the side-affects and toxicity for these and the other above mentioned ingredients that could be compiled and listed here, but for the sake of brevity, that information will not be presented here. That information is well known to the public and the Defendants.

"A single vaccine given to a six-pound newborn is the equivalent of giving a 180-pound adult 30 vaccinations on the same day." Dr. Boyd Haley, Professor and Chair, Dept. of Chemistry, University of Kentucky (2001).

"If children receive all recommended vaccines, they will receive 2,370 times the "allowable safe limit" for mercury in the first two years of life (as if there is such a thing as a "safe" amount of a toxic poison). Yet, even after Congressional hearings instigated by Congressman Dan Burton (whose own grandchild became autistic after receiving vaccines) resulted in the FDA requesting (not ordering) vaccine manufacturers to remove this toxic heavy metal from their products, mercury is still present in many vaccines." Rebecca Carley, M.D.

"No batch of vaccine can be proved safe before it is given to children." Surgeon General of the United States Leonard Scheele, addressing an AMA convention in 1955.

"The only safe vaccine is a vaccine that is never used" Dr. James A. Shannon, National Institutes of Health.

"There is a great deal of evidence to prove that immunization of children does more harm than good." Dr. J. Anthony Morris, formerly Chief Vaccine Control Officer at the FDA.

Immunizations, as is forced upon all Americans as a "one size fits all" mandate is a national scam. There **is** such a thing as "natural" immunity, based on good food, good hygiene, indoor plumbing, excellent nutrition and breast feeding of infants.  There is no conclusive evidence that vaccines have ever cured diseases or saved the lives of Americans or protected the health of children in America.

The change in Americans' general health was due mostly to the implementation of indoor plumbing, clean water, better hygiene, better nutrition, better foods, etc. With the implementation of SB277, the Defendants have stripped away the ability of parents to invoke their natural rights of self-preservation and or to opt out of this criminal assault on their children's lives by being coerced, intimidated, and forced into compliance under this dark cloud of medical and political tyranny.

Plaintiffs, like thousands of others, have been deprived of their, liberty, labor and certain inalienable rights protected by the United States Constitution by the egregious actions of the Defendants.  The Defendants' actions have misused the laws of California and the united States of America for their own special interests.

Further, Plaintiffs are victims of extortion and oppression perpetrated by the Defendants, and each of them, who have consistently and deliberately attempted to overthrow the California and United States Constitutions in violation of their oaths of office, which violates California and United States law including the U.S. Constitution's Bill of Rights.

The Defendants are using Child Protective Services, local law, enforcement agencies, public health agencies and the various California Superintendent of Schools as their affiliates to intimidate, incarcerate and coerce the people of California to comply with this unlawful, tyrannical bill.  The Defendants have unlawfully used the California legislative process in furtherance of their objective to subject Californians to chemical and biological warfare for their own financial gain and profit.  This "R.I.C.O." law suit documents a continuous pattern of violations of federally protected rights perpetrated against Plaintiffs and other California residents by Defendants and their known and unknown affiliates.

Defendants have engaged in a common enterprise, and common course of conduct, the purpose of which is and was to engage in the violations of law alleged in this Complaint. This common enterprise and common course of conduct continues to the present.

This lawsuit further attempts to report and provide evidence that the Defendants are operating the California Legislature like a *criminal enterprise* outside the confines of California and United States Law. The patterns of wrongs that are documented in this lawsuit have inflicted great harm upon Plaintiffs, the citizens of California, the United States and upon the rule of law.

Plaintiffs through this lawsuit seek damages and relief from these violations of numerous state and federally protected rights.  Plaintiffs seek restitution imposing Civil Penalties, and granting all other relief provided for under California and United States Law against all named Defendants, jointly and severally for engaging in their unlawful and corrupt political practices.

## **JURISDICTION**

1. This action arises under the provisions of the Racketeering Influenced and Corrupt Organizations Act, Title 18 U.S.C. §§ 1961- 1964.

2. 18 U.S.C. § 1964(a) and (c)(a). The district courts of the United States shall have jurisdiction to prevent  and restrain violations of section 1962 of this chapter by issuing orders including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise imposing reasonable restrictions on the future activities or investments of any person including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce or ordering

dissolution or reorganization of any enterprise, making due provisions for the rights of innocent persons.

(C) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including reasonable attorney's fees.

3. 28 U.S.C. §§ 1343 and the First Amendment to the United States Constitution which provides for a ***federal court forum*** in which citizens may seek regress from the deprivation of rights, privileges, and immunities under color of state law.

4. 28 U.S.C. § 1331, the general federal question statute. Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971). 28 U.S.C. § 2201 and § 2202, the federal declaratory relief and injunctive relief statutes, to declare the rights of the parties.

5. 28 U.S.C. § 1332 (a)(1), diversity of jurisdiction of citizens of different states and the amount of controversy exceeds $75,000.00.

6. This Court may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Plaintiffs' state law claims for violations of The California Constitution Article 1 § 1 that guarantees all people the right to life, liberty, pursuing and obtaining safety, happiness, and privacy. And Article 1 § 4 of the California Constitution,  which provides that The Legislature shall make no law respecting an establishment of religion, as these claims are so related to the Plaintiffs' claims in the action within the original federal question jurisdiction that it forms part of the same case or controversy under Article III of the United States Constitution.

7. The Constitution for the United States of America, all of the above statutes but not limited thereto.

8. This Incorporated Case is filed under the American Free Flag of peace of the united states of America and UCC 1-103.6. No jurisdiction under any American flags of war will be accepted in this Case Incorporation.

## VENUE

9. Venue of this Court is proper pursuant to Title 28 U.S.C. § 1391(a)(2), (b)(2), because the subject conduct of the defendants is based upon the wrongful acts and harm inflicted against the Plaintiffs by all Defendants complained of herein while Defendants where acting as Agents or Assigns of the People of, and or the State of California.

## PARTIES
### Plaintiffs

10. Plaintiff Travis Middleton, is a private citizen residing in the State of California at 27 West Anapamu Street No. 153 Santa Barbara, California 93101.

11. Plaintiff Eric Durak is a private citizen residing in the State of California at 133 Campo Vista Drive Santa Barbara, California 93111.

12. Plaintiff Jade Baxter is a private citizen residing in the State of California at 207 West Victoria Street Santa Barbara, California 93101.

13. Plaintiff Julianna Pearce is a private citizen residing in the State of California at 28780 My Way, Oneals, California 93645.

14. Plaintiff Candyce Estaves is a private citizen with a vaccine injured Son and daughter residing in the State of California at 430 East Rose Avenue Santa Maria California 93454.

15. Plaintiff Denise Michele Derusha is a private citizen residing in the State of California at 7125 Santa Ysabel Apt. 1 Atascadero, California 93422.

16. Plaintiff Melissa Christou is a private citizen residing in the State of

California at 1522 knoll Circle Drive Santa Barbara, California 93101.

17. Plaintiff Andrea Lewis is a private citizen residing in the State of California at 1331 Santa Barbara St. # 10, Santa Barbra, California 93101.

18. Plaintiff Rachil Vincent is a private citizen residing in the State of California at 4320 Viua Presada, Santa Barbara, California 93110.

19. Plaintiff Don Demanlevesde is a private citizen residing in the State of California at 618 West Ortega Santa Barbara, California 93111.

20. Plaintiff Jessica Haas is a private citizen residing in the State of California at 2715 Verde Vista Santa Barbara, California 93105.

21. Plaintiff Paige Murphy is a private citizen residing in the State of California at 2230 Memory Lane West Lake Village, California 91361.

22. Plaintiff Lori Strantz is a private citizen residing in the State of California at 120 Barranca #B Santa Barbara, California 93109.

23. Plaintiff Anwanur Gielow is a private citizen residing in the State of California at 390 Park Street Buelton, California 93427.

24. Plaintiff Lisa Ostendorf is a private citizen residing in the State of California at 5459 Place Court, Santa Barbara, California 93111.

25. Plaintiff Julia Anne Whitney is a private citizen residing in the State of California at 55 Crestview Lane Montecito, California 93108.

26. Plaintiff Alice Tropper is a private citizen residing in the State of California at 1805 Mountain Avenue Santa Barbara, California 93101.

27. Plaintiff Bret Nielsen is a private citizen residing in the State of California at 2230 Memory Lane West Lake Village, California 91361.

28. Plaintiff Brent Haas is a private citizen residing in the State of California at 2715 Verde Vista Santa Barbara, California 93105.

29. Plaintiff Muriel Rosensweet is a private citizen residing in the State of California at 2230 Memory Lane West Lake Village, California 91361.

30. Plaintiff Marina Read is a private citizen residing in the State of California

at 322 Pebble Beach Drive Goleta, California 93117.

### Defendants

31. Defendant Richard Pan, sued in his personal/private and official capacity, herein after ("Defendant Pan"), is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol, Room 4070 Sacramento, CA 95814.

32. Defendant Win-Li Wang, herein after ("Defendant Wang") is and was at all times material in this complaint, the wife of Defendant Richard Pan, a private citizen doing business in the State of California with a business address of 4136 E. Commerce Way, Suite 100, Sacramento, California 95834.

33. Defendant Martin Jeffrey "Marty" Block, sued in his personal/private and official capacity, herein after ("Defendant Marty Block"), is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol, Room 4072 Sacramento, CA 95814.

34. Defendant Gerald A. "Jerry" Hill, sued in his personal/private and official capacity, herein after ("Defendant G. Hill"), is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol, Room 5035 Sacramento, California 95814-4900.

35. Defendant Holly Mitchell, sued in her personal/private and official capacity, herein after ("Defendant Mitchell"), is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol, Room 5080, Sacramento, California 95814.

36. Defendant Catharine Baker, sued in her personal/private and official capacity, herein after ("Defendant Baker"), is and was at all times material in this complaint a California legislator within the State of California with a business address of the Capitol Office, the State Capitol Sacramento, California 94249.

37. Defendant Christina Garcia, sued in her personal/private and official capacity, herein after ("Defendant Garcia"), is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol P.O. Box 942849 Sacramento, California  94249-005858.

38. Defendant Adrin Nazarian, sued in his personal/private and official capacity, herein after ("Defendant Nazarian"), is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol Post Office Box 942849 Sacramento, California 94249-0046.

39. Defendant Jim Wood, sued in his personal/private and official capacity, herein after ("Defendant Wood"), is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol P.O. Box 942849, Room 6005 Sacramento, California 94249-0002.

40. Defendant Ben Allen, sued in his personal/private and official capacity, herein after ("Defendant Allen"), is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol, Room 2054 Sacramento, California 95814.

41. Defendant Kevin de Leon, sued in his personal/private and official capacity, herein after ("Defendant de Leon"), is and was at all times material in this

complaint a California legislator within the State of California with a business address of the State Capitol, Room 205 Sacramento, California 95814.

42. Defendant Hannah-Beth Jackson, sued in her personal/private and official capacity, herein after ("Defendant Jackson"), is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol, Room 2032 Sacramento, California  95814.

43. Defendant Jeff Stone, sued in his personal/private and official capacity, herein after ("Defendant Stone"), is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol, Room 4062 Sacramento, California 95814.

44. Defendant Richard Bloom, sued in his personal/private and official capacity, herein after ("Defendant Bloom"), is and was at all times material in this complaint a California legislator within the State of California with a business address of Room 2003, State Capitol 1303 Tenth Street Sacramento, California 9581468.

45. Defendant Bill Quirk, sued in his personal/private and official capacity, herein after ("Defendant Quirk"), is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol P.O. Box 942849 Sacramento, California 94249-0020.

46. Defendant Lorena Gonzales, sued in her personal/private and official capacity, herein after ("Defendant Gonzales"), is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol P.O. Box 942849 Sacramento, California 94249-0080.

47. Defendant Reginald Jones-Sawyer, sued in his personal/private and official capacity, herein after ("Defendant Sawyer"), is and was at all times material in this complaint a California legislator within the State of California with a business address of the State Capitol P.O. Box 942849 Sacramento, California 94249-0059.

48. Defendant Isadore Hall, sued in his personal/private and official capacity, herein after ("Defendant Hall"), is and was at all times material in this complaint a California Legislator within the State of California with a business address of the State Capitol, Room 4085 Sacramento, California 95814.

49. Defendant Mark Leno, sued in his personal/private and official capacity, herein after ("Defendant Leno"), is and was at all times material in this complaint a California Legislator within the State of California with a business address of the State Capitol, Room 5100 Sacramento, California 95814-4900.

50. Defendant Bob Wieckowski, sued in his personal/private and official capacity, herein after ("Defendant Wieckowski"), is and was at all times material in this complaint a California Legislator within the State of California with a business address of the State Capitol, Room 3086 Sacramento, California 95814.

51. Defendant David Chiu, sued in his personal/private and official capacity, herein after ("Defendant Chiu"), is and was at all times material in this complaint a California Legislator within the State of California with a business address of 2196 Legislative Office Building Sacramento, California 94249-0017.

52. Defendant Evan Low, sued in his personal/private and official capacity, herein after ("Defendant Low"), is and was at all times material in this complaint a

California Legislator within the State of California with a business address of the state capitol Room 2175 Sacramento, California 94249-0028.

53. Defendant Anthony Rendon, sued in his personal/private and official capacity, herein after ("Defendant Rendon"), is as was at all times material in this complaint a California Legislator within the State of California with a business address of Room 219 State Capitol 1303 Tenth Street Sacramento, California 95814.

54. Defendant Jim Beall, sued in his personal/private and official capacity, herein after ("Defendant Beall"), is as was at all times material in this complaint a California Legislator within the State of California with a business address of the State Capitol, Room 5066 Sacramento, California 95814.

55. Defendant Robert Hertzberg, sued in his personal/private and official capacity, herein after ("Defendant Hertzberg"), is as was at all times material in this complaint a California Legislator within the State of California with a business address of the State Capitol, Room 4038 Sacramento, California 95814.

56. Defendant Mike McGuire, sued in his personal/private and official capacity, herein after ("Defendant McGuire"), is as was at all times material in this complaint a California Legislator within the State of California with a business address of the State Capitol 1303 10th Street, Room 5064 Sacramento, California 95814.

57. Defendant Lois Wolk, sued in her personal/private and official capacity, herein after ("Defendant Lois Wolk"), is and was at all times material in this complaint a California Legislator within the State of California with a business address of the State Capitol, Room 5114 Sacramento, California 95814.

58. Defendant Bruce Wolk, herein after ("Defendant Bruce Wolk"), is and was at all times material in this complaint the spouse of Defendant Lois Walk with a business address of the U.C. Davis Law School, 1 Shields Ave, Davis, California 95616.

59. Defendant Jim Cooper, sued in his personal/private and official capacity, herein after ("Defendant Cooper"), is and was at all times material in this complaint a California Legislator within the State of California with a business address of the State Capitol Post Office Box 942849 Room 5158 Sacramento, California 95814.

60. Defendant Mark Stone, sued in his personal/private and official capacity, herein after ("Defendant Mark Stone"), is and was at all times material in this complaint a California Legislator within the State of California with a business address of the State Capitol, Room 5155, 1303 Tenth Street Sacramento, California 95814 95.

61. Defendant Edmund Gerald "Jerry" Brown, Jr., sued in his personal/private and official capacity, herein after ("Defendant Brown") is and was at all times material in this complaint the governor of the State of California with a business address of the State Capitol, suite 1173 Sacramento, California 95814.

62. Defendant Anne Gust, herein after ("Defendant Gust") is and was at all times material in this complaint the wife of Defendant Jerry Brown with a business address of the State Capitol, suite 1173 Sacramento, California 95814.

63. Defendant Alicia G. Rosenberg, sued in her personal/private and official capacity, hereinafter ("Defendant Rosenberg") is and was at all times material in this complaint a Magistrate Judge in the United States District Court, Western Division, with a business address of 312 North Spring Street 8th Floor, Los Angeles California 90012.

64. Defendant Jonathan E. Rich, sued in his personal/private and official capacity, hereinafter ("Defendant Rich") is and was at all times material in this complaint a Deputy Attorneys General for the State of California with a business address of 300 South Spring Street, Suite 1702 Los Angeles, California 90013.

65. Defendant Jacquelyn Y. Young, sued in her personal/private and official capacity, hereinafter ("Defendant Young") is and was at all times material in this complaint a Deputy Attorneys General for the State of California with a business address of 300 South Spring Street, Suite 1702 Los Angeles, California 90013.

66. Defendant Cara L. Jenkins, sued in her personal/private and official capacity, hereinafter ("Defendant Jenkins") is and was at all times material in this complaint a Deputy Legislative Counsel for the State of California's Legislature with a business address of 925 L Street, Suite 700 Sacramento, California  95814.

67. Defendant the STATE OF CALIFORNIA, herein after ("Defendant CALIFORNIA") is and was at all times mentioned in this complaint a corporate fiction with a business address of 1300 "I" Street Sacramento, California 95814-2919.

68. Plaintiffs are informed and believe, and based thereon allege, that at all times relevant herein, each Defendant, regardless of how named was designated, the

Agent, Assign, Servant, and/or Employee of each and every other Defendant, and at all times relevant herein was acting within the purpose, scope, and course of said Agency, Assignment, Service and Employment, with the express and/or implied knowledge, permission, and consent of the remaining Defendants, and each of the said Defendants ratified and approved the acts of each such Defendants.

69.  The Plaintiffs are informed and believe, and on that basis allege, that the Defendants, and each of them, were, at all relevant times acting within the purpose and scope of said agency and employment, and that each Defendant has ratified and approved the acts of its agents. The allegations of the Complaint stated on information and belief are likely to have Evidentiary Support, after a reasonable opportunity for further Investigation and Discovery.

## FACTS APPPLICABLE TO ALL CLAIMS FOR RELIEF

70.  *"In around December 2014, it was reported that at least 40 visitors of Disneyland contracted measles at the park between December 17–20, 2014, triggering an outbreak, especially due to the presence of intentionally unvaccinated individuals. The likely "patient zero" was speculated to be an international visitor to the park"*.  Source, *WikiPedia.com*.

71.  This is the so-called reason that spawned the vaccine bill SB277 authored by Defendants Richard Pan, Ben Allen and Lorena Gonzales.

Quoting the L.A. Times: *"Although epidemiologists have not yet identified the person who brought measles to Disneyland, a new analysis shows that the highly contagious disease has spread to seven states and two other countries thanks to parents who declined to vaccinate their children"*.

72.  This statement is a total fabrication. Given the fact that the health officials have yet to properly identify the infected person who purportedly visited Disneyland, there is no way of determining how, where or who these alleged

recipients contracted the measles from in the first place. Additionally, if the health officials have failed to identify the person who started the original infection, then it would by next to impossible to determine not only where this infamous person has been, where they've since traveled and how many others may or may not have come into contact with him or her. In any event, the infected people were identified and properly quarantined and treated.  This seems hardly a need for a mandatory vaccine bill for all Californians.

73.  If the other news sources are correct in that this person was from another country, how and why does this fact even remotely suggest that American parents who chose not to vaccinate "their" children (which according to California Health officials make up only 2.5% of the populace), are somehow responsible for this so-called outbreak?  Such a claim is dubious at best. There is no plausible scientific or other kind of evidence to support this nonsensical view. According to the CDC, *"Measles can be prevented with the MMR (measles, mumps, and rubella) vaccine. One dose of MMR vaccine is about 93% effective at preventing measles if exposed to the virus, and two doses are about 97% effective. In the United States, widespread use of measles vaccine has led to a greater than 99% reduction in measles cases compared with the pre-vaccine era. Since 2000, when measles was declared eliminated from the U.S., the annual number of people reported to have measles ranged from a low of 37 people in 2004 to a high of 668 people in 2014. Most of these originated outside the country or were linked to a case that originated outside the country"*.

74.  If the statistics from the CDC are true that the measles vaccine is 93% to 97% effective in preventing measles, and the measles have already been declared

eliminated in the United States since 2000, then even if 37 people in 2004 and 668 people in 2014 came down with measles, these numbers are still extremely small compared to the number of people living in the United States which is around 323 million, 394 thousand people.  California has nearly 39 million people. Out of 39 million people, 30 to 40 infected people who got adequate medical care does not constitute an outbreak.  And, according to the CDC, if the MMR vaccine is 93% to 97% effective, then why and how did some of the vaccinated people who were exposed acquire the measles? This narrative by the CDC officials is pure fiction. Additionally, there is no evidence that unvaccinated children can infect people with diseases that they do not have. And, if the measles have been determined to have been eliminated from the U.S. which has estimated well over 323 million people, then in light of these numbers the whole Disneyland event is just another contradiction and falsehood.

75.   Also, how is it possible for the officials to make a determination of the cause and origin of the other purported seven states with infectious people? One could argue that these events are not related at all to the Disneyland event.

*"Based on historical data, infectious disease experts know that in the absence of any vaccination, a single person infected with measles can spread it to between 11 and 18 other people. They also know that it takes 10 to 14 days for one measles case to lead to another".* -L.A. Times.

76.   If this statement is true, then there is at least a ten-day to two week period of time that will pass before any person who comes into contact with anyone infected with the measles will show any symptoms. The possibilities are endless as to how many places and people a person may come into contact with once infected. There is no way of certainty to determine where a person was infected and who infected

them. Since the daily attendance at Disneyland is somewhere between 40 to 50,000 people, why didn't more people get infected? This whole measles outbreak narrative is simply beyond preposterous.

*"The index patient in the 3-month-old Disneyland outbreak was probably exposed to the measles overseas and then visited the Anaheim amusement park while contagious, according to the Centers for Disease Control and Prevention. This particular strain of measles is identical to one that spread through the Philippines last year, where it sickened about 58,000 people and killed 110. No deaths have been traced to the Disneyland outbreak".*
*http://www.latimes.com/science/sciencenow/la-sci-sn-disneyland-measles-under-vaccination-20150316-story.html.*  But this was in the Philippines, not the U.S.

77.   In reading the above quote from the L.A. Times article where it is purported that:

*"the "3-month-old Disneyland outbreak was probably exposed to the measles overseas and then visited the Anaheim amusement park while contagious.....This particular strain of measles is identical to the one that spread through the Philippines last year, where it sickened about 58,000 people and killed 110".*

78.   Again, since the Center for Disease Control has seemingly already admitted that this strain of measles is identical to the one that spread throughout the Philippines last year where it sickened about 58,000 people and killed 110, one could conclude either that all of California's parents who refuses to vaccinate their children (or at least some of them-the 2.5 %) were in the Philippines at this same time last year to become exposed to and contract this strain of measles and only a few of these parents or kids showed up at Disneyland to infect others.  But, if that were the case these same Americans and their children would have already been treated for the disease either while in the Philippines or shortly after they returned to the States. This narrative suggests that the CDC is also accusing both the unvaccinated children along with the unidentified person as the cause of the

Disneyland event both at the same time, thus making this narrative a fabrication larger than Yosemite National Park.

79.   It has been over a year since the outbreak in the Philippines, so to put the blame on the parents who refuses to vaccinate their children is totally bogus and without merit.  Or, did this infamous "patient zero" cause this infectious event? But, again this individual has yet to be identified so it is unlikely that the CDC can point the finger at this "ghost" either. More likely than not, there is no "patient zero". This fictitious person is a creation of the Defendants to assist them in their attempt to legitimize the Measles event at Disneyland and to further pass unlawful and unconstitutional legislation known as SB277 and other bills like it.

80.   In view of these severe discrepancies and falsehoods in the official reports of this Disneyland measles event, one could conclude that the whole event is a hoax on a grand scale and that the Defendants and their P.R. people should learn to lie better.


**The Lies Corruption and Deceit Continues on The Floor of The Legislature**

81.   The Sacramento Bee reports; "The bill heads to the Senate Judiciary Committee, the next step in a potentially long odyssey winding through several committees and floor votes in both the Assembly and Senate. Every Democrat on the Judiciary Committee is either a co-sponsor of the bill or has voted for it." As the committee chair, Carol Liu, offered Senator Pan an extra week due to the bill's imminent demise, Defendant Pan was caught on camera receiving his orders

from lobbyists Jodi Hicks and Janus Norman. The senator has former working ties to both. This is an extreme conflict of interest.

82.   According to an article from 2014 in the Sacramento Bee:

"As a UC Davis pediatrician, Pan was an active member of the group that lobbies for doctors in the Capitol, known as the California Medical Association. Jodi Hicks was the association's chief lobbyist. … and is a partner in a Sacramento lobbying firm called DiMare, Brown, Hicks & Kessler. She routinely seeks Pan's votes as she lobbies for clients that include associations representing family physicians, eye doctors and podiatrists. Those three groups have together given more than $20,000 to Pan's campaign."

83.   Hicks daughter, Seneca, appeared in Defendant Pan's campaign commercials. Hicks said about her daughter Seneca appearing in Defendant Pan's campaign commercials, "I don't think anyone other than a few of us here in Sacramento know it's a lobbyist's daughter." Interestingly enough, Jodi Hicks now works for DiMare, Brown, Hicks & Kessler, LLC (DBHK) and was named Capitol Weekly's "Top 100", an annual ranking of the most powerful players in California politics. It is my opinion that Ms. Hicks is near the top of a dubious, stinking pile of corruption.

84.   Defendants Pan, Allen and Gonzalez then colluded and conspired with Jodi Hicks and other lobbyist to encourage the other Defendant legislators through monetary compensation to join in, support and pass SB277.

85.                    **TOP DRUG MAKER DONORS**

State records show that pharmaceutical companies and trade groups donated more than $2 million to current lawmakers in 2013-2014.

| Pharmaceutical company or group | Campaign donations to current state legislators | Direct lobbying payments |
|---|---|---|
| Johnson & Johnson Inc. | $86,300 | $583,926 |
| GlaxoSmithKline | $32,250 | $561,479 |
| Eli Lilly & Company | $193,100 | $280,863 |
| Gilead Sciences Inc. | $77,600 | $196,732 |
| Biocom PAC | $30,000 | $223,224 |
| Sanofi | $48,000 | $172,500 |
| Abbott Laboratories | $173,600 | $42,500 |
| Astellas Pharma US Inc. | $47,900 | $161,440 |
| AstraZeneca Pharmaceuticals LLP | $157,300 | $49,583 |
| Merck & Co. Inc. | $91,600 | $108,204 |
| California Pharmacists Association | $53,389 | $134,176 |
| Pharmaceutical Research & Manufacturers Assn. | $137,950 | $45,455 |
| Eisai Inc. | $92,000 | $88,000 |
| Bristol-Myers Squibb Company | $32,300 | $144,101 |
| Pfizer | $150,600 | $21,250 |
| AbbVie | $138,425 | $25,530 |
| Amgen | $105,600 | $45,455 |
| Allergan USA Inc. | $120,100 | $22,757 |
| Takeda Pharmaceuticals USA Inc. | $40,000 | $83,348 |
| Pharmacy Professionals of California | $32,000 | $0 |

2nd Amended R.I.C.O. Complaint, 7th Amendment Jury Trial Demanded- 30

## TOP DRUG MAKER RECIPIENTS

| Lawmaker | Party/District | Amount |
|---|---|---|
| Sen. Richard Pan* | D-Sacramento | $95,150 |
| Assembly Speaker Toni Atkins | D-San Diego | $90,250 |
| Sen. Ed Hernandez* | D-Azusa | $67,750 |
| Sen. Holly Mitchell* | D-Los Angeles | $60,107 |
| Assemblyman Brian Maienschein* | R-San Diego | $59,879 |
| Senate President Pro Tem Kevin de León | D-Los Angeles | $56,648 |
| Sen. Isadore Hall | D-Compton | $52,400 |
| Sen. Jerry Hill | D-San Mateo | $50,209 |
| Assemblyman Henry Perea | D-Fresno | $49,550 |
| Assemblywoman Shirley Weber | D-San Diego | $47,000 |
| Assemblyman Mike Gatto | D-Los Angeles | $46,491 |
| Assemblywoman Susan A. Bonilla* | D-Concord | $45,600 |
| Sen. Andy Vidak | R-Hanford | $42,800 |
| Assemblyman Tom Daly | D-Anaheim | $40,300 |
| Assemblyman Kevin Mullin | D-South San Francisco | $38,400 |
| Assemblyman Adam Gray | D-Merced | $37,000 |
| Assemblyman Rob Bonta* | D-Alameda | $36,750 |
| Assemblyman Anthony Rendon | D-Lakewood | $36,200 |
| Assemblyman Jimmy Gomez* | D-Los Angeles | $33,850 |
| Assemblyman Richard Gordon | D-Menlo Park | $33,100 |

*Member of the Assembly or Senate health committees

Source: Bee analysis of secretary of state campaign finance and lobbying reports.

86.   Pharmaceutical companies and their trade groups gave more than $2 million to current members of the Legislature in 2013-2014, about 2 percent of the total raised, records show. Nine of the top 20 recipients are either legislative leaders or serve on either the Assembly or Senate health committees. Receiving more than

$95,000, the top recipient of industry campaign cash is Defendant Sen. Richard Pan, a Sacramento Democrat and doctor who is carrying the vaccine bill.

87.   In addition, the industry donated more than $500,000 to outside campaign spending groups that helped elect some current members last year. Leading pharmaceutical companies also spent nearly $3 million more during the 2013-2014 legislative sessions lobbying the Legislature, the governor, the state pharmacists' board and other agencies, according to state filings. In short, the Defendant legislators, including Defendant Gerald Brown where bought and paid for by the drug companies to corruptly influence the outcome of the votes to pass SB277. All one has to do is follow the money trail.

88.   All of the corruption of the Defendant legislators in passing SB277 is underscored by the criminal fraud and corruption being perpetrated by the Center for Disease Control (CDC) with respect to the efficacy of the MMR and other vaccines.  See Dr. William H. Thompson's MMR Report and Dr. DeStephano's report attached under ***Exhibit G.*** Despite this fact the CDC has and is still standing on their claims that all vaccines are safe, effective and needed by our society. This is yet another bright and shining lie motivated around politicians and the drug cartels' financial incentives to keep getting richer at the expense of the health and well-being of Plaintiffs' offspring. Meanwhile the Vaccine Court in New York has paid out 3.2 billion dollars in settlements for vaccine injured plaintiffs.  Just taking into account the amount of pay-outs given to citizens who've been injured from vaccinations is enough proof that vaccines are not safe and not effective.

## The CDC And Merck Has Come Under Fire Due To Corruption and Fraud

89.   In a recent article written by the Huffington Post on 9/25/2014:

"Merck, the pharmaceutical giant, is facing a slew of controversies over its Measles-Mumps-Rubella (MMR) vaccine following numerous allegations of wrongdoing from different parties in the medical field, including two former Merck scientists-turned-whistleblowers. A third whistleblower, this one a scientist at the Centers for Disease Control, also promises to bring Merck grief following his confession of misconduct involving the same MMR vaccine.

The controversies will find Merck defending itself and its vaccine in at least two federal court cases after a U.S. District judge earlier this month threw out Merck's attempts at dismissal. Merck now faces federal charges of fraud from the whistleblowers, a vaccine competitor and doctors in New Jersey and New York. Merck could also need to defend itself in Congress: The staff of representative Bill Posey (R-Fla) -- a longstanding critic of the CDC interested in an alleged link between vaccines and autism -- is now reviewing some 1,000 documents that the CDC whistleblower turned over to them.

The first court case, United States v. Merck & Co., stems from claims by two former Merck scientists that Merck "fraudulently misled the government and omitted, concealed, and adulterated material information regarding the efficacy of its mumps vaccine in violation of the FCA [False Claims Act]."

According to the whistleblowers' court documents (see **Exhibit G**), Merck's misconduct was far-ranging: It "failed to disclose that its mumps vaccine was not as effective as Merck represented, (ii) used improper testing techniques, (iii) manipulated testing methodology, (iv) abandoned undesirable test results, (v) falsified test data, (vi) failed to adequately investigate and report the diminished efficacy of its mumps vaccine, (vii) falsely verified that each manufacturing lot of mumps vaccine would be as effective as identified in the labeling, (viii) falsely

certified the accuracy of applications filed with the FDA, (ix) falsely certified compliance with the terms of the CDC purchase contract, (x) engaged in the fraud and concealment describe herein for the purpose of illegally monopolizing the U.S. market for mumps vaccine, (xi) mislabeled, misbranded, and falsely certified its mumps vaccine, and (xii) engaged in the other acts described herein to conceal the diminished efficacy of the vaccine the government was purchasing."

These fraudulent activities, say the whistleblowers, were designed to produce test results that would meet the FDA's requirement that the mumps vaccine was 95 per cent effective. To the whistleblowers' delight, the judge dismissed Merck's objections to the case proceeding, finding the whistleblowers had plausible grounds on all of the claims lodged against Merck.

If the whistleblowers win, it would represent more than a moral victory (they repeatedly tried to stop Merck while still in its employ). Under the False Claims Act, the whistleblowers would receive a share -- likely 25 per cent to 30 per cent -- of the amount the government recovers. Previous settlements involving extensive fraud by pharmaceutical companies under the False Claims Act have run into the hundreds of millions of dollars, and in some cases such as against GlaxoSmithKline and Pfizer, into the billions.

The second court case, Chatom Primary Care v. Merck & Co. relies on the same whistleblower evidence. This class action suit claims damages because Merck had fraudulently monopolized the mumps market. Doctors and medical practices in the suit would be able to obtain compensation for having been sold an overpriced monopolized product, and a defective one to boot, in that the mumps vaccine wasn't effective (indeed, the suit alleged that Merck expected outbreaks to

<u>occur</u> and, as predicted, they did -- mumps epidemics occurred in 2006 in a highly vaccinated population and again in 2009-2010).

"Plaintiffs have argued sufficient facts to sustain a claim for proximate causation, detailing the significant barriers that other companies would face to enter the mumps vaccine market," the court ruled.

"The third whistleblower -- a senior CDC scientist named William Thompson -- only indirectly blew the whistle on Merck. He more blew it on himself and colleagues at the CDC who participated in a 2004 study involving the MMR vaccine. Here, the allegations involve a cover-up of data pointing to high rates of autism in African-American boys after they were vaccinated with MMR. See *Exhibit G*. In what could be high-profile House hearings before Congressman Posey's Science Committee -- hearings made all the more explosive given the introduction of race into the mix -- Merck could find itself under unprecedented scrutiny. The <u>CDC still stands by its study</u> although Frank DeStefano, the CDC's Director of Immunization Safety and a co-author in the CDC study, also stated that <u>he plans to review his notes</u> with an eye to reanalyzing the data. Some say all publicity is good. In Merck's case, regardless of the ultimate merits, the publicity will be all bad." See attached reports by Dr. Thompson and DeStefano under *Exhibit G.*

*-Huffington Post.*

90.   The Defendants Pan, Allen, Gonzalez and the other Defendant legislators knew before hand of these lawsuits and were aware of the harmful heavy metals inside these vaccines long before the house and senate hearings on SB277.  The Defendant legislators were at this point already paid off by the lobbyist from the

pharmaceutical cartels and did not care about their lawful duty to do the right thing under the law as required by their oaths of office.

### Defendants' Ongoing, Open-Ended Pattern of Racketeering Activity

91.   On information and belief, in furtherance of their racketeering scheme the Defendant legislators routinely engaged in unlawful service and duties to their offices and to the citizens they purport to represent by accepting bribes in the form of money and other considerations from drug company lobbyists to pass legislation that extorts the rights of the citizens of California for the Defendants' own financial gain and profit *under color of official right*. For purposes of this section, description of "under color of official right", the Supreme Court held that the "under color of official right" prong of the Hobbs Act could be used to prosecute political corruption as long as there was a quid pro quo. See *McCormick v. United States*, 500 U.S. 257 (1991). See also *United States v. Giles*, 246 F.3d 966 (7th Cir. 2001) (holding that the quid pro quo requirement of McCormick applies outside the campaign contribution context); Peter D. Hardy, The Emerging Role of the Quid Pro Quo Requirement in Public Corruption Prosecutions Under the Hobbs Act, 28 U. Mich. J.L. Reform 409 (1995). In *Evans v. United States* (1992), the Court held that no affirmative act of inducement is required on the part of the public official.

92.   On information and belief, in furtherance of their racketeering scheme Defendant legislators routinely violate their Oaths of office which mandates that they support and defend the California and United States constitutions, including the Bill of Rights, from all enemies foreign and domestic, especially with respect to any law making activities affecting the liberties of the citizens of the state of California whom they purport to represent. The Defendant legislators willfully,

wantonly and recklessly violated their oaths to the California and U.S. constitutions by passing SB277.

93.   Further, on information and belief, in furtherance of their racketeering scheme Defendant legislators routinely have meetings on the house floor and senate to give the public the illusion that legitimate democratic processes are at work within the procedures and hearings of the state capitol building, when in fact Defendants collude and conspire with one another in conducting secret meetings behind closed doors before and afterwards to corruptly influence the outcome of the passage of certain bills for their own financial gain and profit, all while extorting the liberty and freedoms of Plaintiffs and other California residents.

94.   On information and belief, in furtherance of their racketeering scheme Defendant legislators routinely collude and conspire with one another to use the house and senate hearings at the state capital as their conduit and venue to extort the liberty and certain rights of Plaintiffs and other California citizens of their property, money and liberty by sham, oppressive legislation like SB277 and other similar bills.

95.   On information and belief, in furtherance of their racketeering scheme Defendant legislators' receive the financial benefit of their corrupt activities through their salaries and pensions which are all directly or indirectly derived from the activities of their standard pay which is over $97,000 per annum plus the illegal contributions and bribes from the drug companies and their lobbyist while in office.

96.   On information and belief, in furtherance of their racketeering scheme, Co-conspirators Defendant legislators' spouses have conspired to aid, abet, encourage

and supported the Defendant legislators in their corrupt and criminal enterprises
while receiving the financial benefit of their public officials' corrupt activities.
These Defendant spouses and Co-conspirators are, Win-Li Wang, Bruce Wolk, and
Anne Gust. These Co-conspirators have supported their spouses while accepting all
the benefits from the enterprises corrupt criminal activities. Benefits which include
but are not limited to: Vacations, Health Care, Fund Raisers and Galas, Cash, Real
and Personal Property including vehicles and slush fund accounts. Despite the
above mentioned spouses' awareness that their counter parts where involved in a
criminal enterprise, they still supported them and accepted the benefits of
enterprise's illegal activities.

## **Defendants' Predicate Acts of Obstruction of Justice & Conspiracy to Obstruct Justice**

97.   Defendant legislators, Defendants Alicia G. Rosenberg, Jonathon E. Rich,
Jacquelyn Y. Young, Cara L. Jenkins and Defendant Edmund Brown on behalf of
the Defendant State of California, have conspired with, aided, abetted, colluded
and agreed with one another to engage in a continuous pattern of racketeering
activity as defined in 18 U.S.C. § 1961 Subsection 1503, in that they have engaged
in two or more predicate acts of Obstruction of Justice within the preceding two
years using the California Legislature and the District Court for the Central District
of California as conduits in violation of 18 U.S.C. § 1961 Subsection 1503 as fully
described herein.

98.   Defendant legislators and Defendants Alicia G. Rosenberg, Jonathon E. Rich,
Jacquelyn Y. Young, Cara L. Jenkins and Defendant Edmund Brown on behalf of
the Defendant State of California, conspired and colluded with one another, agreed
to join the conspiracy, agreed to commit predicate acts (breach or perjury of their

oaths), and knew that those acts were part of a pattern of racketeering activity. Each and every Defendant legislator, Defendants Alicia G. Rosenberg, Jonathon E. Rich, Jacquelyn Y. Young, Cara L. Jenkins and Defendant Edmund Brown on behalf of the Defendant State of California agreed to participate in the conduct of the affairs of the criminal enterprise through a pattern of racketeering activity, and further engaged in a conspiracy to pervert or obstruct justice with the intent to corruptly influence the outcome of the state legislative law making process on the floor of the house and senate hearings and the December 13th Court Hearing in violation of 18 U.S.C. § 1962(d)). All of the above mentioned predicate acts committed by the Defendant legislators and the other named Defendants were condoned and sanctioned by the Defendant State of California.

**99. Defendant Alicia G. Rosenberg Gives Plaintiffs The Judicial Equivalent of The Willie Lync / Rodney King Treatment.**

In failing to address Plaintiffs' legal claims Defendant Alicia G. Rosenberg takes the legal position of using her office as Magistrate Judge to "Lynch" the Plaintiffs. Defendant Rosenberg is essentially "Making a Slave" of Plaintiffs. Here are some excerpts from the famous Willie Lynch Letter from the bank of the James River in the colony of Virginia in 1712.  Lynch was a British slave owner in the West Indies. He was invited to the colony of Virginia in 1712 to teach his methods to slave owners there. "I HAVE A FULL PROOF METHOD FOR CONTROLLING YOUR BLACK SLAVES. I guarantee every one of you that, if installed correctly, IT WILL CONTROL THE SLAVES FOR AT LEAST 300 HUNDREDS YEARS. My method is simple. Any member of your family or your overseer can use it…….. LET'S MAKE A SLAVE "The Original and Development of a Social Being Called 'The Negro.'" Let us make a slave. What do we need? First of all, we need a black nigger man, a pregnant nigger woman and her baby nigger boy. Second, we will use the same basic principle that we use in breaking a horse,

combined with some more sustaining factors. What we do with horses is that we break them from one form of life to another; that is, we reduce them from their natural state in nature. Whereas nature provides them with the natural capacity to take care of their offspring, we break that natural string of independence from them and thereby create a dependency status, so that we may be able to get from them useful production for our business and pleasure. For fear that our future generations may not understand the principles of breaking both of the beast together, the nigger and the horse. We understand that short range planning economics results in periodic economic chaos; so that to avoid turmoil in the economy, it requires us to have breadth and depth in long range comprehensive planning, articulating both skill sharp perceptions. We lay down the following principles for long range comprehensive economic planning. Both horse and niggers [are] no good to the economy in the wild or natural state. Both must be BROKEN and TIED together for orderly production. For orderly future, special and particular attention must be paid to the FEMALE and the YOUNGEST offspring. Both must be CROSSBRED to produce a variety and division of labor. Both must be taught to respond to a peculiar new LANGUAGE. Psychological and physical instruction of CONTAINMENT must be created for both. We hold the six cardinal principles as truth to be self-evident, based upon following the discourse concerning the economics of breaking and tying the horse and the nigger together, all inclusive of the six principles laid down above. NOTE: Neither principle alone will suffice for good economics. All principles must be employed for orderly good of the nation. Accordingly, both a wild horse and a wild or natur[al] nigger is dangerous even if captured, for they will have the tendency to seek their customary freedom and, in doing so, might kill you in your sleep. You cannot rest. They sleep while you are awake, and are awake while you are asleep. They are DANGEROUS near the family house and it requires too much labor to watch them away from the house. Above all, you cannot get them to work in this natural state. Hence, both the

2nd Amended R.I.C.O. Complaint, 7th Amendment Jury Trial Demanded- 40

horse and the nigger must be broken; that is breaking them from one form of mental life to another. KEEP THE BODY, TAKE THE MIND! In other words, break the will to resist. Now the breaking process is the same for both the horse and the nigger, only slightly varying in degrees. But, as we said before, there is an art in long range economic planning."

100. In the case in chief Defendant Alicia G. Rosenberg is attempting to create a slave or "break the niggers" by her recommendation. This is the judicial equivalent of the "Rodney King" "Nigger Treatment", except Defendant Alicia G. Rosenberg is not using whips, chains, horses, Tasers, or Billie clubs for her whipping and breaking. She is using her bench as a manner and means of stating all niggers stay out of my court room and or go home. Apparently that is the extent of the due process Plaintiffs can expect from these proceedings.

101.   The predicate act of Obstruction of Justice, 18 U.S.C. §1503 provides: -Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States (the State of California is enjoined and incorporated into the United States as an agency and or subsidiary by and through the 14th Amendment) , or the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress.

-  Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede...... or by any threatening letter or communication, influences, obstructs, or impedes, or

endeavors to influence, obstruct, or impede, the due administration of justice, shall
be punished as provided in subsection (b).

(b) The punishment for an offense under this section is—

(1) In the case of a killing, the punishment provided in sections 1111 and 1112;
(2) In the case of an attempted killing, or a case in which the offense was
committed against a petit juror and in which a class A or B felony was charged,
imprisonment for not more than 20 years, a fine under this title, or both; and

**(3) In any other case, imprisonment for not more than 10 years, a fine under
this title, or both.**

**FIRST CLAIM FOR RELIEF FOR VIOLATION OF
THE RACKETEERING INFLUENCED AND CORRUPT
ORGANIZATIONS ACT ("RICO") 18 U.S.C. § 1961
(By Plaintiffs Against All Defendants)**

102.  Plaintiffs reallege and incorporate in this First Claim for Relief each and
every allegation set forth above as though fully set forth herein.

103.   A "R.I.C.O." enterprise may include courts. *United States v. Angelilli*, 660
     F.2d 23 (2nd Cir. 1981).  (See *United States v. Thompson*, 685 F.2d 993
     (6thCir.1982), alleging that governor's office in Tennessee was a criminal
     enterprise.) See also *United States v. Stratton*, 649 F.2d 1066 (1981) alleging
     that Florida's Third Judicial Circuit met the requisite of a "RICO" enterprise;
     *United States v. Clark*, 646 F.2d1259 (8th Cir. 1981), holding that a
      governmental agency can be a RICO enterprise, and listed several, including
     examples: the office of county judge to be an enterprise under the "RICO"
     Act and any other government agencies or offices; *United States v. Altomare*,
     625 F.2d 5, 7, n.7 (4th Cir. 1980), the office of county prosecutor; *United
     States v. Grzywacz*, 603 F.2d 682, 686 (7th Cir.1979), the city police
     department. Among the government units that have been held to be"

enterprises" are offices of **governors** and <u>**state legislators**</u>, courts and court clerks' offices. See e.g., *United States v. Stratton*, 649 F.2d 1066, 1072-75 (5th Cir. 1981);

104.   The "R.I.C.O." enterprise described herein consists of all the named Defendants: Richard Pan, Win-Li Wang, Martin Jeffrey "Marty" Block, Gerald A. "Jerry" Hill, Holly Mitchell, Catharine Baker, Christina Garcia, Adrin Nazarian, Jim Wood, Ben Allen, Kevin de Leon, Hannah-Beth Jackson, Jeff Stone, Richard Bloom, Bill Quirk, Lorena Gonzalez, Reginald Jones-Sawyer, Isadore Hall, Mark Leno, Bob Wieckowski, David Chiu, Evan Low, Anthony Rendon, Jim Beall, Robert Hertzberg, Mike McGuire, Lois Wolk, Bruce Wolk, Jim Cooper, Mark Stone, Edmund G. Brown Jr., Anne Gust, Alicia G. Rosenberg, Jonathon E. Rich, Jacquelyn Y. Young, Cara L. Jenkins and The State of California.

105.   At all relevant times herein, all Defendants and the Co-conspirators were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(4).

106.   At all relevant times herein, Defendants and Co-conspirators formed an association-in-fact for the specific purpose of extorting the constitutional rights of Plaintiffs, their school-age offspring and those similarly situated as such rights are guaranteed and secured by the First Amendment (right of deeply held spiritual beliefs in rejecting having certain animal and or human tissues or poisonous chemicals forced into their offspring's bodies; the rights of parents to choose a particular medical procedure with respect to their offspring whether born or unborn; the right to informed consent over a medical procedure regarding their offspring); and, by the Fourth Amendment (the right of privacy and to be let alone by government, or anyone or any agency acting on government's behalf);

and, by the Fifth Amendment (the right not to be assaulted, maimed or killed with a needle filled with poisonous substances without due process of law, or the right not to lose their life, health, well-being or liberty without due process of law); and, by the Fourteenth Amendment (the right of due process of law before any rights may be taken away, and the equal protection of ALL laws state and federal including but not limited to the right to opt out of any tyrannical governmental medical experiment or treatment.

107. This association-in-fact was an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

108. At all relevant times herein, this "law" making enterprise was engaged in, and its activities affected interstate and foreign commerce, within the meaning of RICO, 18 U.S.C. § 1961 (Sec. 1951).

109. At all relevant times herein, all Defendants and other Co-conspirators associated with this enterprise conducted or participated directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961 (Sec. 1952), in violation of RICO, 18 U.S.C. § 1961 & 1962(C) and as alleged in paragraphs 70 through 109 above.

110. 18 U.S.C. § 1961 provides in pertinent parts:
(1). "racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: